Stephen J. Joncus
Oregon Bar No. 013072
JONCUS LAW P.C.
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
Telephone: (971) 236-1200
Facsimile: (971) 244-7997
steve@joncus.net

*Attorney for Paul Thomas, M.D.*

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| Paul Thomas, MD,<br><br>Plaintiff<br><br>v.<br><br>Kathleen Harder, MD; Saurabh Gupta, MD; Erin Cramer, PA-C; Robert Cahn, MD; James Lace, MD; Charlotte Lin, MD; Patti Louie, PhD; Jennifer Lyons, MD; Ali Mageehon, PhD; Chere Pereira; Chris Poulsen, DO; Andrew Schink, DPM; Jill Shaw, DO; Anthony Domenigoni, DPM; Paula Lee-Valkov, MD; Rick Goldstein, MD; Eric Brown; Jason Boemmels; and David Farris, MD,<br><br>Defendants. | Case No. 3:22-cv-944<br><br><br><br><br><br>**COMPLAINT**<br><br><br><br><br><br><br><br><br><br><br><br><br><br>Jury Trial Demanded |

**INTRODUCTION**

1.    This case is about the unjustified and malicious destruction of the medical practice of Plaintiff Paul Thomas, M.D., FAAP, ABAM ("Dr. Thomas") by the members of the Oregon Medical Board ("OMB" or "Board"). Dr. Thomas is the founder and owner of Integrative Pediatrics which once had a substantial business with ten medical providers. Through a series of unlawful actions, Defendants stripped Dr. Thomas of his license to practice medicine because Dr. Thomas had the temerity to follow the law and give his patients informed consent.

2.    Through observation and scientific inquiry, Dr. Thomas asked questions and sought information about the health outcomes of vaccinated children compared to unvaccinated children. The results of his scientific inquiry demonstrate that children who receive the full CDC recommended vaccine schedule are much less healthy than children who do not.

3.    Parents are entitled to information about childhood vaccines so that they can make their own informed choices about which vaccines their children should take. Dr. Thomas gave them information based on the best available science.

4.    To the Board, informed consent with regards to childhood vaccines means that it is a doctor's responsibility to strong-arm the parents into agreeing to vaccinate their child in accordance with the CDC recommendations. Due to the Board's attitude about childhood vaccination, many pediatricians in Oregon will not accept patients

whose parents refuse to have their children vaccinated according to the CDC recommendaitons.

5.      Because Dr. Thomas follows the law and provides his patients with real informed consent, the Board sought to destroy and silence him. The Board has succeeded in destroying Dr. Thomas' medical practice, his marriage, and his peace of mind.

## PARTIES

6.      Plaintiff Dr. Paul Thomas, M.D., FAAP, ABAM, ("Thomas"), is a graduate of  Dartmouth Medical School and has been practicing pediatric medicine for over 30 years. He is the owner Integrative Pediatrics and an individual residing in Washington County, Oregon.

7.      Defendant Kathleen Harder, MD was a member of the Board's Investigative Committee in December 2020 and was the Chair of the Board in December 2020. Harder is still a member of the Board with her term expiring on February 28, 2023. Harder signed the Order of Emergency Suspension dated December 4, 2020. Harder practices internal medicine Salem, Oregon. Harder ran unsuccessfully in the 2022 primary to be the Democrat Party candidate for Representative in Oregon's 6th Congressional District. Harder is sued both in her individual capacity and her professional capacity as a member of the Board.

8.      Defendant Saurabh Gupta, MD was a member of the Board in December 2020. Gupta was the Chair of the Board's Investigative Committee in December 2020. Gupta is not currently a member of the Board. Gupta practices cardiology in Portland, Oregon. Gupta is sued both in his individual capacity and his professional capacity as a member of the Board.

9.      Defendant Erin Cramer, PA-C was a member of the Board in December 2020 and is still a member of the Board with his term expiring February 28, 2025. Cramer was a physician assistant and an athletic trainer. He is now an administrator with the title of Medical Clinics Director for the medical clinics serving the communities of Santiam Hospital. Cramer is sued both in his individual capacity and his professional capacity as a member of the Board.

10.      Defendant Robert Cahn, MD was a member of the Board and on its Investigative Committee in December 2020. Cahn is now the Chair of the Board and is still on its Investigative Committee although the Board's website states that his term expired February 22, 2022. Cahn is a general surgeon in Portland, Oregon. Cahn is sued both in his individual capacity and his professional capacity as a member of the Board.

11.      Defendant James Lace, MD was a member of the Board in December 2020. Lace is a pediatrician in Salem, Oregon. Lace is sued both in his individual capacity and his professional capacity as a member of the Board.

12.     Defendant Charlotte Lin, MD was a member of the Board and on its Investigative Committee in December 2020. Lin is still on the Board and on its Investigative Committee with her term expiring February 29, 2024. Lin is sued both in her individual capacity and her professional capacity as a member of the Board.

13.     Defendant Patti Louie, PhD was a public member of the Board in December 2020 and is still a member of the Board with her term expiring February 29, 2024. Louie is sued both in her individual capacity and her professional capacity as a member of the Board.

14.     Defendant Jennifer Lyons, MD was a member of the Board in December 2020 with her term expiring February 28, 2022. Lyons is sued both in her individual capacity and her professional capacity as a member of the Board.

15.     Ali Mageehon, PhD was a member of the Board in December 2020 and is still a member of the Board with her term expiring February 28, 2023. Mageehon is sued both in her individual capacity and her professional capacity as a member of the Board.

16.     Defendant Chere Pereira was a member of the Board as a Public Member in December 2020. Pereira is still a member of the Board with her term expiring February 28, 2023. Pereira was on the Investigative Committee in December 2020. Pereira was an administrator for premedical and predental programs at Oregon State

University for 29 years. Pereira is sued both in her individual capacity and her professional capacity as a member of the Board.

17.     Defendant Chris Poulsen, DO was a member of the Board in December 2020 and was on its Investigative Committee. Poulsen is still a member of the Board and is its Vice Chair. Poulsen is still on the Investigative Committee and is its Chair. Poulsen is practices general emergency medicine in Eugene, Oregon. Poulsen's rating on one website is two stars out of five. Poulsen is sued both in his individual capacity and his professional capacity as a member of the Board.

18.     Defendant Andrew Schink, DPM was a member of the Board in December 2020 with his term expiring February 28, 2021. Schink is sued both in his individual capacity and his professional capacity as a member of the Board.

19.     Defendant Jill Shaw, DO was a member of the Board in December 2020 and is still a member of the Board with her term expiring February 28, 2023. Shaw is sued both in her individual capacity and her professional capacity as a member of the Board.

20.     Defendant Anthony Domenigoni, DPM became a member of the Board on July 1, 2021 with a term ending February 29, 2024. Domenigoni is sued both in his individual capacity and his professional capacity as a member of the Board.

21.     Defendant Paula Lee-Valkov, MD became a member of the Board on July 1, 2021 with a term ending February 29, 2024. Lee-Valkov is sued both in her individual capacity and her professional capacity as a member of the Board.

22.     Defendant Rick Goldstein, MD became a member of the Board on April 7, 2022 with a term ending February 28, 2025. Goldstein is sued both in his individual capacity and his professional capacity as a member of the Board.

23.     Defendant Eric Brown was an investigator for Board assigned to investigate Dr. Thomas. Brown is sued both in his individual capacity and his professional capacity as an employee of the Board.

24.     Defendant Jason Boemmels is an investigator for the Board assigned to investigate Dr. Thomas. Boemmels is sued both in his individual capacity and his professional capacity as an employee of the Board.

25.     Defendant David Farris, MD is the Medical Director for the Board. Farris is sued both in his individual capacity and his professional capacity as an employee of the Board.

<u>**JURISDICTION**</u>

26.     This action arises under federal law, including 42 U.S.C. § 1983 and 1988, to redress the deprivation, under the color of state law, of rights, privileges, and immunities secured to Plaintiffs by the Constitution of the United States.

27.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343. This Court has personal jurisdiction over the Defendants because they have committed acts in this district that violate the rights of Plaintiffs protected by the Constitution and laws of the United States. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

28.     Dr. Thomas seeks damages for the violation of his rights under the United States Constitution and laws of the United States and Oregon.

## BACKGROUND

29.     Dr. Thomas is the oldest child of missionaries with the United Methodist Church. When he was 5, his family moved from the United States to Africa, and he grew up in Rhodesia, now called Zimbabwe, in the 1960's. His family's home in the village of Arnoldine, was built out of sun-dried bricks, had no running water, no electricity, and no glass windows.

30.     Dr. Thomas' mother was a nurse, and their home became the de facto health center for the village. By the time Dr. Thomas was in his teens, he had seen more deaths than most Americans will see in their lifetimes. It was not uncommon for mothers and their babies to die during childbirth. Newborns, especially those with malnourished mothers, succumbed to infectious diseases. These experiences inspired Dr. Thomas' ambition to become a pediatric doctor to make it his life's work to promote the health of children.

31.     Dr. Thomas received his medical degree from Dartmouth Medical School.
When he was a resident, the Hib vaccine was first introduced for a strain of bacteria,
*Haemophilus influenzae* type B, that can cause severe infections like meningitis and death,
especially in small children. At that time, children's hospitals had several cases of
meningitis at any given time. In the first year the improved Hib vaccine was
introduced, in 1987, rates of pediatric meningitis at his hospital dropped by half.
Before the Hib vaccine about twenty thousand children under five came down with life-
threatening infections caused by *Haemophilus influenzae* type B every year and about a
thousand died. These days there are fewer than twenty-five cases of Hib a year and no
deaths.

32.     Vaccines are complex products. Each vaccine contains many ingredients,
ranging from 8 to 32 different ingredients, making them among the most complex
pharmaceutical products.

33.     Vaccines are administered to healthy people. In contrast, pharmaceuticals
are primarily given to sick people. The poor health of a sick person means that there is
a reason to accept risk of damage from the pharmaceutical in exchange for the benefit
provided by the pharmaceutical. In contrast, the acceptable level of risk in
administering a vaccine is much lower because the person is healthy.

34.     The first principle of being a doctor is first do no harm. The principle comes into sharp relief when recommending the vaccines that should be taken from birth to adulthood.

35.     Vaccines are also given predominantly early in life when the patient has barely begun life and has a lenghty life expectancy. In contrast, pharmaceutical use becomes more extensive as patients get older and accelerate near the end of life. Damage to a patient's health caused by a medicine at the initial stages of life that may last for their lifetime is much more significant than damage caused by a medicine administered nearer to the end of a patient's life.

36.     In view of the foregoing factors, one would think that the rational approach would be to subject vaccines to the most rigorous testing standards prior to approval. But the opposite is true.

37.     Vaccines are classified as biologics thus allowing their ingredients and the finished vaccine product to be untested or tested minimally before being brought to market.

38.     The vaccine industry is rife with conflicts of interest. The CDC which recommends the vaccine schedule for the population of the United States, holds 54 vaccine patents. The vaccine companies employ a who's who of former government officials that used to be responsible for regulation of the vaccine companies. High office holders in the government are often plucked from the vaccine companies, where they

will return after having served their purpose steering government policy in favor of the vaccine companies.

39. Product liability law, which is the primary method of policing unsafe products in the marketplace, has been eliminated for childhood vaccines. The National Childhood Vaccine Injury Act of 1986 gave the vaccine manufacturers immunity from liability for their products.

40. Unshackled by the risk of product liability lawsuits, the number of vaccines for children has increased dramatically since the National Childhood Vaccine Injury Act of 1986. Over the same period, the state of children's health has degraded significantly.

41. In 1983, the CDC recommended a total of 11 total shots for children, spaced out between the ages of two months and sixteen years, to protect against seven diseases.

42. In 1986, Congress passed the Vaccine Act that gave blanket immunity to vaccine companies for injuries cause by vaccines.

43. In 1988, about 12.8% of children had chronic disease.[1]

44. In 2017, the CDC recommended a total of 53 shots beginning in the first hours of life through age sixteen, to protect against sixteen diseases.

---

[1] Anthony R Mawson, et al, *Pilot comparative study on the health of vaccinated and unvaccinated 6- to 12-year-old U.S. children*, J. Transl. Sci. 3: DOI: 10.15761/JTS.1000186.

45.    In 2011, about 54% of children have chronic disease.

46.    In 2011, about 1 in 6 children have developmental disabilities such as ADHD and autism.[2]

47.    Today, the CDC estimates that one in every forty-five American children has an autism spectrum disorder.

48.    Dr. Thomas has been practicing medicine for over 30 years. Dr. Thomas is a diplomate of the American Board of Addiction Medicine. Dr. Thomas was a board-certified fellow of the American Academy of Pediatrics, passing all recertification exams and requirement for 30 years until the Board's actions triggered the American Academy of Pediatrics to revoke his board certification in 2021.

49.    In the Fall of 1988, Dr. Thomas began practicing medicine at Emanuel Children's Hospital in Portland, Oregon. As the years went by in his practice, he noticed that children who followed the advice for vaccination were not as healthy as they should have been. By the late 1990's and into the 2000's he noticed an increase in chronic diseases and other conditions including food allergies, attention deficit disorders, childhood anxiety, childhood asthma, childhood depression, eczema, gastroesophageal reflux, headaches, ear infections, neurological disorders, sinus

---

[2] Coleen A. Boyle, et al, *Trends in the prevalence of developmental disabilities in US children 1997-2008*, Pediatrics 2011: 127(6): 1034-42.

infections, lung infections like pneumonia, urinary tract infections, virulent strep throat, to name a few.

50.     Most significant has been the devastating rise in autism. The rise in autism is impossible to ignore. When Dr. Thomas was in medical school from 1981 through 1985, autism was rarely seen. Dr. Thomas saw only a couple of mild cases of autism while in residency during 1985 through 1988. By the time that Dr. Thomas was working at as a pediatrician at Westside Pediatrics in the late 1990's and early 2000's, he was sending one child almost every month to a specialist for suspected neurological disorders.

51.     It became obvious to Dr. Thomas that some environmental factor or combination of factors was negatively affecting the health of the children in his care.

52.     Dr. Thomas also came to realize that the recommendations that are made today do not seem to add up when one looked at the science—or the lack of science.

53.     In 2003, the facts finally overwhelmed Dr. Thomas. While listening to multiple presentations at a medical conference about autism, he realized that the CDC schedule of recommended vaccines was poisoning children with mercury. No one from the CDC had ever calculated the cumulative amounts of mercury in the childhood vaccine schedule at the time.

54.     Dr. Thomas later discovered that the CDC made the same mistake with aluminum. The current CDC-recommended childhood vaccine schedule exceeds the toxic limits of safe aluminum exposure.

55.     Parents have a legal right to choose whether and how their children are vaccinated. Parents are entitled to information so that they can make an informed choice. Many pediatricians today will not give them that choice. The recommended CDC schedule has been transformed into mandatory requirements in states such as Oregon where the medical boards refuse to accept any questioning of their vaccine dogma. Many pediatricians today will not accept patients who question the full CDC schedule.

56.     This case is a particular example of how the Board and its individual members sought to destroy Dr. Thomas because he asked questions and failed to blindly follow its anti-science doctrine that all children must be injected with all the CDC recommended vaccines.

57.     Dr. Thomas has shown, with peer reviewed scientific inquiry, that children who do not follow the CDC recommended vaccine schedule are much healthier than fully vaccinated kids. For the sin of following the science and revealing truth, the Board engaged in a campaign to punish Dr. Thomas. In its zeal to crush opposing views, the Board succeeded in destroying Dr. Thomas' medical practice, marriage, and peace of mind.

58. In 2008, Dr. Thomas opened his own clinic, Integrative Pediatrics, where he has served over 11,000 pediatric patients.

59. In August 2016, Dr. Thomas published his book, "The Vaccine-Friendly Plan: Dr. Paul's Safe and Effective Approach to Immunity and Health—from Pregnancy Through Your Child's Teen Years." His book discusses his alternative vaccine schedule based on his experience from his pediatric practice, as well as data from other credible and scientifically minded medical doctors.

60. Dr. Thomas points out in his book that the most important thing to protect in children is their developing brain.

61. The CDC estimates that today, one in every forty-five American children has an autism spectrum disorder. This along with other brain-related problems have increased dramatically in parallel with the dramatic increase since 1986 in the number of vaccine shots that the CDC recommends.

62. A natural scientific observation, given the in autism and other disorders that track with the rise in childhood vaccination since 1986, is to question whether the vaccines are poisoning children's brains at the time when they are the most vulnerable.

63. Mercury is cytotoxic, neurotoxic, immune toxic and nephrotoxic. Due to its ability to cross the blood brain barrier mercury is especially toxic to brain tissue.

64. The National Research Council (NRC) recommended a maximum daily exposure of 0.1 micrograms of methylmercury per kilogram per day. The CDC allowed

more: 0.3 micrograms per kilogram per day; the FDA allowed even more: 0.4 micrograms per kilogram per day.

65.     In a conference in 2003, Dr. Thomas did the math. The vaccines given to a 2-month-old baby amounted to 62.5 micrograms of mercury who might weigh 5 kilograms. This is 125 times the NRC's safety limit; 42 times the CDC's safety limit; and 31 times the FDA's safety limit.

66.      But the government has never admitted that there was a problem. Due to these revelations, the vaccine manufacturers voluntarily reduced the amount of mercury in their vaccines. To this day the U.S. government and public health officials deny that there was too much mercury in pediatric vaccines. A lesson from this episode is that the government cannot be trusted to properly regulate vaccines.

67.     Aluminum is a neurotoxin that in sufficient amounts will impair neurological development and cause cognitive difficulties.

68.     The FDA guideline states that 4 to 5 micrograms per kilogram per day will cause aluminum to accumulate at levels associated with central nervous system toxicity. For a 4 kilogram newborn this corresponds to 16 to 20 micrograms of aluminum as, what is perhaps, a safe limit.

69.     The hepatitis B vaccine recommended to be given to every newborn has 250 micrograms of aluminum or about 15 times what the FDA says is the safe limit.

70.     On top of that, most newborns have no risk of contracting hepatitis B. Hepatitis B is a sexually transmitted disease that is transmitted through intimate sexual contact or through drug abuse utilizing needles. Newborns have no chance of catching hepatitis B unless they are born to a mother who is hepatitis B positive.

71.     Giving the hepatitis B vaccine to a newborn violates the principle of first do no harm because there is no benefit (except when the mother is hepatitis B positive) and can create harm. Yet, the authorities, including the Board, blindly demand obedience to the CDC schedule.

72.     Dr. Thomas' book, "The Vaccine-Friendly Plan: Dr. Paul's Safe and Effective Approach to Immunity and Health-from Pregnancy Through Your Child's Teen Years"[3] discusses Dr. Thomas' alternative vaccine schedule based on results from his pediatric practice and information from other credible and scientifically minded medical doctors. To date Dr. Thomas' book has sold more than 100,000 copies.

73.     As described in his book, for the more than 1,000 children born into Dr. Thomas' practice who followed his vaccine-friendly plan there were no cases of autism. Other doctors around the country with similar protocols also saw excellent results.

74.     In contrast, for those who presumably follow the advice of mainstream pediatricians—the recommended CDC vaccine schedule—one in forty-five children are diagnosed with autism. The difference in outcomes between Dr. Thomas' patients and

[3] Incorporated to this Complaint by reference.

other children is stark and sobering. Autism is a significant life-changing impairment that lasts a lifetime. The dramatic increase since 1986 in rate that autism strikes our children is a national tragedy. That this dramatic increase is likely caused by vaccines intended to protect children is sickening.

75.     If you were a parent, would you not want to know that one in forty-five children following the CDC schedule become autistic, while zero in 1,000 children who followed the vaccine-friendly plan became autistic? Dr. Thomas wants to inform you of those facts. The Board wants to silence Dr. Thomas so that you will not be informed of those facts.

**Oregon Medical Board's Campaign Against Dr. Thomas**

76.     Dr. Thomas published his "Vaccine-Friendly Plan" in 2016. Starting in December 2018, the Board began its campaign aimed at damaging Dr. Thomas' medical career and reputation. Since December 2018, OMB has been scouring the earth with the intent to find something to put Dr. Thomas out of business. The reason that the Board is singling out Dr. Thomas because he dares to give parents factually accurate information about the risks of the childhood vaccines. For that, the Board is hellbent on ruining him.

77.     On or about December 26, 2018, the Board sent a letter to Dr. Thomas claiming that it was investigating a "complaint" about care he provided to a child. The

Board did not identify who made the complaint or what prompted the investigation. In fact, Dr. Thomas never treated the child.

78.     Yet, under the guise of legal authority, the OMB used this initial "complaint" about a child never treated by Dr. Thomas to harass and burden Dr. Thomas and his medical practice by issuing numerous overly broad demands for patient records. Despite the unreasonable nature of the OMB's records requests, Dr. Thomas complied in good faith and, in doing so, provided the OMB with a voluminous number of records that included hundreds of patient names. To Dr. Thomas' knowledge, the OMB never initiated formal disciplinary proceedings against him in relation to the child involved in the initial "complaint" it purportedly received.

79.     On or about July 23, 2020, the OMB sent a letter to Dr. Thomas notifying him that the OMB received another "complaint" alleging Dr. Thomas engaged in unethical "human medical research" when for a study titled, "Can Integrative Medicine approaches and a selective vaccination schedule impact the health and rates of autism in a general pediatric population?" Again, the OMB did not reveal who made the complaint or what prompted this investigation.

80.     But Dr. Thomas had received a regulatory opinion in 2015 from the Western Institutional Review Board ("WIRB") stating that the research that Dr. Thomas was planning to perform was permitted under the law. It was permitted

because it involved existing documents and the data utilized would be devoid of any identifying information linked to the identity of the patients.

81.     In early 2019, the Board asked Dr. Thomas to show that his vaccine-friendly plan was better than the CDC recommended schedule.

82.     Dr. Thomas then initiated an analysis of the population of his patients and the health outcomes as a function of vaccination status. The patient data was collected an anonymized. James Lyons-Weiler, an expert in data analysis, performed the analysis.



**Figure 5.** Analysis 5. Cumulative office visits in the vaccinated (orange) vs. unvaccinated (blue) patients born into the practice: the clarity of the age-specific differences in the health fates of individuals who are vaccinated (2763) compared to the 561 unvaccinated in patients born into the practice over ten years is most strikingly clear in this comparison of the cumulative numbers of diagnoses in the two patient groups. The number of office visits for the unvaccinated is adjusted by a sample size multiplier factor (4.9) to the expected value as if the number of unvaccinated in the study was the same as the number of vaccinated.

83.     This is exactly the information the Board asked Dr. Thomas to produce. But the answer did not comport with the Board's dogmatic opinion. On December 3, 2020, a few days after Dr. Thomas' peer-reviewed paper became available online, the Board's Investigative Committee met. Harder reviewed the case for the Investigative Committee which then forwarded the case to the full Board for action. On that same day, December 3, 2020, the full Board met. All eleven Board members who were present voted to suspend Dr. Thomas' license to practice medicine on an emergency basis.

84.     The Board suspended Dr. Thomas license on the basis that he was a danger to the public. To the contrary, Dr. Thomas and his scientific results are a danger to the Board and to their dogmatic adherence to the CDC schedule. The supposed scientists and bureaucrats at the Board were not interested in science—they were interested in forcing compliance with the accepted dogma.

**The Board violated its rules for Suspension of Dr. Thomas' License**

85.     Pursuant to ORS 677.205(3), "the board may temporarily suspend a license without a hearing, <u>simultaneously with the commencement of proceedings under ORS 677.200</u> if the board finds that evidence in its possession indicates that a continuation in practice of the licensee constitutes an immediate danger to the public."

86.     But the Board violated ORS 677.205(3) by issuing an emergency suspension without simultaneously commencing proceedings. The Board did not issue a notice of proposed disciplinary action or other form of written complaint as required under ORS 677.200 until April 22, 2021, nearly five months after the emergency suspension order.

87.     The Board's actions in Dr. Thomas' case are not permitted by the Board's rules or the Administrative Procedures Act because it would effectively permit the Board to suspend Dr. Thomas's license, indefinitely, without affording him the protections of a formal disciplinary proceeding, including his right to obtain and review the Board's investigatory file in preparing his defense.

88.     OMB had absolutely no justification for issuing an emergency suspension order because, for one thing—there was no emergency.

89.     The CDC's vaccine recommendations are just that—recommendations. But the Board treats these recommendations as requirements. Any physician who disagrees with the CDC recommendations is a danger to the public according to the Board.

90.     But it is the Board that is the danger to the public. Its insistence on absolute fealty to the CDC recommendations is anti-science.

91.     Knowledge about the world is gained through the scientific method. The scientific method is a systematic approach to discovering new information about the

material world. It involves observation, forming a hypothesis, testing the hypothesis, interpreting the test results, and reaching a conclusion.

92.     The nature of science is to question. "The important thing is to not stop questioning." Albert Einstein. "The scientist is not a person who gives the right answers, he's one who asks the right questions." Claude Lévi-Strauss.

93.     "In questions of science, the authority of a thousand is not worth the humble reasoning of a single individual." Galileo Galilei

94.     Knowledge about childhood vaccines cannot progress when questioning the safety of the CDC recommendations is considered so dangerous that even venturing into the facts is too great a risk.

95.     Dr. Thomas published facts that question the safety of the CDC recommendations. By trying to silence Dr. Thomas, the Board is trying to use its authority stop the progress of knowledge.

96.     By trying to silence Dr. Thomas, the Board is trying to take away the rights of parents to informed consent. Like totalitarians throughout history, the Board wants to limit the spread of knowledge that contradict the official narrative and to strip parents of access to information that contradicts the Board.

97.     The Board has no science backing its contention that the CDC recommendations are safe. The CDC recommendations have never been tested as a whole. In contrast Dr. Thomas' alternative schedule has been tested as a whole. Not a

single patient, out of more than a 1,000 following Dr. Thomas' schedule, as cited in his book, has been diagnosed with autism.

98.     The factual grounds given by the Board for its suspension of Dr. Thomas' license were frivolous, full of falsehoods, and without any urgency.

99.     Patient A. The Board alleged a dispute with a patient's mother that never happened. Dr. Thomas saw the patient only twice in 2013 and denies the Board's claim. The Board falsely alleged that Dr. Thomas failed to document the patent's declination of vaccination for Patient A. Nothing about what the Board alleged happened in 2013 supports the notion of an emergency in December 2020.

100.    The Board had no grounds for discipline of Dr. Thomas due to his interactions with Patient A.

101.    Patient B. Patient B was diagnosed with pertussis in September 2018 and was successfully treated with office visits and antibiotics. The Board's allegations failed to set forth specific reasons whey Dr. Thomas' alleged conduct constituted an immediate danger to the public. According to the Board, the conduct occurred in September 2018. The Board failed to explain how alleged conduct occurring two and half years earlier constitutes an immediate danger to the public.

102.    The Board's allegations concerning Patient B make is sound like parents in Dr. Thomas' practice have to commit to accepting a delayed vaccination schedule.

This impression created by the Board's description is false. Dr. Thomas provides parents with facts—it is their choice how they want to vaccinate their children.

103.    The Board alleged that there were no records of parental refusal of vaccines for Patient B. To the contrary, the records for Patient B show that his parents declined vaccination for pertussis on April 2, 2014, August 19, 2015, and April 15, 2020. The parents of Patient B had the authority to decline the pertussis vaccination and they did decline the pertussis vaccination. The Board's allegation was false.

104.    The Board alleged that pertussis is a fully vaccine-preventable illness. The Board's allegation was false.

105.    The Board had no grounds for discipline of Dr. Thomas due to his interactions with Patient B.

106.    <u>Patient C</u>. The Board falsely asserts that Patient C was diagnosed with Kawasaki Disease in August 2013. When Patient C was admitted to the hospital, the treating physician said that they did not know whether Patient C had Kawasaki Disease.

107.    The Board intentionally exaggerated its allegations concerning Patient C. Patient C was appropriately treated in a timely manner by Dr. Thomas. Patient C's parents are completely happy with the treatment that their son received from Dr. Thomas.

108.    The events relied by the Board regarding Patient C occurred in 2013—

seven years before the Board issued an emergency suspension of Dr. Thomas' medical

license.

109.    Patient C is also not vaccinated, a choice made by his parents and

properly documented by Dr. Thomas.

110.    The Board had no grounds for discipline of Dr. Thomas due to

interactions with Patient C.

111.    <u>Patient D</u>. At six years of age, Patient D was a completely unvaccinated

boy who sustained a forehead laceration, was stitched up at home, and developed

tetanus. Patient D spent almost 2 months in the ICU at Doernbecher Children's

Hospital. By merely including Patient D in its emergency order the Board deceptively

conveyed that Patient D was Dr. Thomas' patient before his injury. Patient D was not

Dr. Thomas' patient before the injury. The Board's deceptive description was designed

to intentionally create a false impression.

112.    Patient D was not seen by Dr. Thomas until *after* Patient D was

discharged from the hospital. Omitting this critical fact amounts to a fraudulent

misrepresentation by the Board.

113.    Also not disclosed by the Board is the reason that Dr. Thomas saw

Patient D was because other doctors would not accept Patient D because his parents

adamantly refused to vaccinate him. During Patient D's first visit with Dr. Thomas in

2017, the parents made it clear to Dr. Thomas that they would refuse all vaccinations. There was no basis for any discipline of Dr. Thomas related to Patient D. The Board's emergency discipline of Dr. Thomas three years after he saw Patient D is without any justification and is an intentionally hostile act designed to damage Dr. Thomas.

114.    Patient E. Patent E became hospitalized with rotavirus gastroenteritis, that the Board contends could have been preventable by vaccination. But, the refusal by the parents of Patient E to vaccinate their daughter was documented by Dr. Thomas.

115.    The Board's conclusion that Dr. Thomas breached the standard of care for Patient E boils down to an indictment against Dr. Thomas because he respected the parents' right to informed consent. By sanctioning Dr. Thomas, the Board ignores the law that it is the parents' right to refuse vaccination. The Board found Dr. Thomas unfit for duty because Dr. Thomas refuses to violate Oregon law requiring him to obtain informed consent. The Board's allegations were false.

116.    The Board had no grounds for discipline of Dr. Thomas due to interactions with Patient E, much less the emergency discipline that he received.

117.    Patient F. The Board lists ailments suffered by Patient F, but none of those ailments are targeted by any childhood vaccine. The Board next says that Patient F was unvaccinated. These non sequiturs were designed by the Board to falsely create the impression that Patient F's ailments were due to non-vaccination. They accuse Dr. Thomas of failing to address Patient F's lack of vaccination. But Patient F's parents

declined vaccination in November 2013, January 2014, July 2014, November 2014, January 2017, December 2017, January 2019, and August 2020. The Board's allegations were false. Again, the Board is punishing Dr. Thomas for following the law by practicing informed consent.

118.     The Board's remaining assertions about Patient F are unrelated to vaccination. Patient F was referred to Dr. Thomas to obtain an IgE allergy testing and he performed those tests. Dr. Thomas' treatment of Patient F considered things that most other doctors do not consider because they do not keep up on the science. Far from negligent, Dr. Thomas treatment of Patient F was exemplary.

119.     The Board had no grounds for discipline of Dr. Thomas due to interactions with Patient F, much less the emergency discipline that he received.

120.     <u>Patients G and H</u>. The Board's emergency suspension alleged that Dr. Thomas was negligent in advising the parents of twins, Patient G and Patient H. The twins were hospitalized with rotavirus gastroenteritis when they were 10 months old. The Board alleged that the mother of Patient G and Patient H believed that her twins had received the rotavirus vaccine. The Board alleged that Dr. Thomas inadequately documented the vaccination decisions of the parents and failed to provide clarity to the parents. In fact, the parents made their own decision not to vaccinate their children. The Board's allegations are false. The Board knew that the allegations were false or was

reckless as to the truth when it made these allegations. The Board intended to harm Dr. Thomas with these false allegations.

121.    The Board had no grounds for discipline of Dr. Thomas due to interactions with Patients G and H, much less the emergency discipline that he received.

122.    The MMR vaccine is directed towards measles, mumps, and rubella. After one dose of the MMR vaccine, about 90 to 95% of children do not need a second dose of the MMR vaccine. It is therefore prudent to test for immunity prior to administering a second MMR shot that most kids do not need. Indeed, testing is the only ethical thing for a doctor to do because there are risks to vaccination and it is unprofessional to provide unnecessary treatment. Moreover, parents have the right to request antibody testing and parents have the right to refuse a second dose of the MMR vaccine regardless of whether the first dose conferred immunity.

123.    In the Board's upside-down worldview, it determined that Dr. Thomas was guilty of unprofessional or dishonorable conduct for obtaining immunity tests for measles, mumps, and rubella for 905 patients between 2002 and 2015.

124.    Of the 905 patients, 90 had low immunity response and did not get a second dose of the MMR vaccine. The Board bizarrely found Dr. Thomas responsible for not ensuring these 90 patients were given the second MMR dose. The Board's finding is in direct contravention of law. It is not Dr. Thomas' job to ensure that these

patients get a second MMR dose. That is the opposite of Dr. Thomas' job under Oregon law. Dr. Thomas' job is to give information to parents so that they make an informed choice. These children do not belong to Dr. Thomas and they do not belong to the Board. It is the parent's choice whether their children receive any vaccination. Neither the Board, nor Dr. Thomas get to make decisions for parents.

125.    The Board had no grounds for discipline of Dr. Thomas for obtaining immunity tests for Measles, mumps, and rubella for 905 patients, much less the emergency discipline that he received.

126.    Under normal circumstances, the investigation would have proceeded confidentially, behind closed doors. Once the Board was ready, and the matter thoroughly investigated, it would have issued a proposed notice of discipline. Dr. Thomas could demand a fair hearing and the Board would file the notice and ONLY THEN the allegations would be made public.

127.    Instead, the Board issued a false emergency notice based on lies, suspending Dr. Thomas' license on an emergency basis based only upon alleged incidents that were many years-old. But by making the emergency suspension public, the Board let the media run rampant, republishing all the false claims over and over again, severely damaging Dr. Thomas.

128.    After much damage was done, the emergency suspension issued on December 4, 2020 was ten withdrawn by the Board on June 3, 2021.

129.    Since the withdrawal of the emergency suspension, Defendants continue

to try to scour the earth for material to charge Dr. Thomas. Dr. Thomas has been

subjected to one investigatory letter after another. Defendants seek to find some

nuggets that they can twist to justify their campaign to ruin Dr. Thomas.

## FIRST CLAIM FOR RELIEF

### VIOLATION FREEDOM OF SPEECH UNDER
### 1ST AMENDMENT to the UNITED STATES CONSTITUTION

### (42 U.S.C. § 1983)

130.    Plaintiff realleges and incorporates by reference the foregoing allegations

as if fully set forth herein.

131.    Dr. Thomas enjoys a constitutionally protected right to freedom of

speech. Dr. Thomas' constitutionally protected free speech right may not be impaired

by Defendants.

132.    Dr. Thomas has a free speech right to publish his research on the health

effects of childhood vaccines. Dr. Thomas has a free speech right to inform his patients

of the benefits and risks of childhood vaccines. Dr. Thomas' right to free speech is a

fundamental right protected by the United States Constitution.

133.    By taking disciplinary actions against Dr. Thomas and by continuously

investigating him, Defendants are illegally seeking to silence Dr. Thomas from

speaking the truth about childhood vaccines with his patients.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF PROCEDURAL DUE PROCESS UNDER
### 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION

### (42 U.S.C. § 1983)

134.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

135.     Medical licensure is a property interest.

136.     The 2020 Board Defendants failed to follow the proper legal process to deprive Dr. Thomas of his medical license.

## THIRD CLAIM FOR RELIEF

### NEGLIGENCE

137.     Defendants Brown and Boemmels were the investigators that wrote false and misleading allegations against Dr. Thomas. On information and belief, Brown and Boemmels were managed by Farris.

138.     Defendants Brown and Boemmels did not actually interview the individuals cited in their report. They instead relied on second-hand information. Defendants Brown and Boemmels wrote allegations that were factually not true. Defendants Brown and Boemmels knew that the allegations that they made were factually untrue.

139.     Brown and Boemmels knew that their false and misleading allegations would likely cause damage to Dr. Thomas. It was foreseeable that preparation of these

false and misleading allegations would cause harm to Dr. Thomas. The conduct of Brown and Boemmels caused a foreseeable risk of harm to Dr. Thomas.

140.    Dr. Thomas' practice and livelihood is an interest that is protected by the law from negligent invasion. The conduct of Brown and Boemmels was unreasonable in light of the risk. The conduct of Brown and Boemmels caused actual damage to Dr. Thomas. Dr. Thomas was within the class of persons and Dr. Thomas' injury was within the general type of potential incidents and injuries that made defendant's conduct negligent.

## FOURTH CLAIM FOR RELIEF

### DEFAMATION

141.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

142.    The false and misleading report made by Brown and Boemmels were libelous and defamatory. Brown and Boemmels provided these statements to other Defendants and knew, or had reason to believe that publication of these statements to the public was likely.

143.    The report written by Brown and Boemmels was defamatory per se.

## FIFTH CLAIM FOR RELIEF

### Tortious Interference with Economic Advantage

144.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

145.    Dr. Thomas has a multitude of professional and business relationships with his patients, employees, providers, insurers, professional organizations, and other medical boards.

146.    By preparing their false and misleading allegations, Brown and Boemmels sought to intentionally interfere with Dr. Thomas' multitude of business and professional relationships.

147.    Brown and Boemmels wrote their false and misleading allegations with an improper purpose, to damage Dr. Thomas. The false and misleading allegations written by Brown and Boemmels caused damage to Dr. Thomas' professional and business relationships, whereby Dr. Thomas suffered actual damages.

## SIXTH CLAIM FOR RELIEF

### Vicarious Liability

148.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

149.    The Board Member Defendants on the Board in December 2020 are vicariously liable for the negligence of Brown and Boemmels.

150.    In creating their false and misleading allegations Brown and Boemmels were employed by the 2020 Board Defendants and they were acting within the scope of their employment.

151.    The 2020 Board Defendants are vicariously liable for Farris' failure to properly supervise Brown and Boemmels.

152.    The 2020 Board Defendants are vicariously liable for Brown and Boemmels intentional torts of tortious interference and defamation.

153.    Brown and Boemmels commited their intentional torts of defamation and tortious interference within the time and space limits authorized by their employment.

154.    Brown and Boemmels commited their intentional torts of defamation and tortious interference with a motivation to serve their employer.

155.    Brown and Boemmels were employed by the 2020 Board Defendants to perform investigations such as their investigation of Dr. Thomas.

## SEVENTH CLAIM FOR RELIEF

### ABUSE OF PROCESS

156.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

157.    Defendants have an ulterior motive to silence Dr. Thomas from speaking about the risks of childhood vaccines with patients and the public. This ulterior motive is unrelated to their job to regulate physicians in Oregon.

158.    The 2020 Board Defendants intentionally violated the rules for disciplining physicians in furtherance of their ulterior motive.

159.    The 2020 Board Defendants seized Dr. Thomas medical license in the furtherance of their ulterior motive.

## EIGHTH CLAIM FOR RELIEF

### NEGLIGENCE PER SE / ORS § 677.205

160.    Plaintiff realleges and incorporate by reference the foregoing allegations as if fully set forth herein.

161.    The 2020 Board member may only temporarily suspend a license without a hearing if the continued practice of the licensee constitutes an immediate danger to the public.

162.    There was no immediate danger to the public.

163.    The Board violated Dr. Thomas' rights pursuant to ORS § 677.205.

164.    Dr. Thomas is among the class of persons meant to be protected by the statute.

165.    Dr. Thomas was injured as a result of the Board's violation.

166.    The injury suffered by Dr. Thomas is of a type that the statute was enacted to prevent.

167.    The 2020 Board Defendants are negligent per se for violating Dr. Thomas' rights pursuant to ORS § 677.205.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a jury trial of all issues triable to a jury in this action.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A.      A judgement for damages against Defendants in the amount of at least 35 million dollars;

B.      Attorney fees; and

C.      Such other and further relief and the Court deems just.


Respectfully submitted,

Dated:  July 1, 2022          By:      s/ Stephen J. Joncus

**Stephen J. Joncus**, OSB No. 013072
Email: steve@joncus.net
JONCUS LAW P.C.
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
Telephone: (971) 236-1200
Facsimile: (971) 244-7997
steve@joncus.net

*Attorney for Plaintiff*