BEFORE THE

OREGON MEDICAL BOARD

STATE OF OREGON

In the Matter of )
)
PAUL NORMAN THOMAS, MD ) ORDER OF EMERGENCY
LICENSE NO. MD15689 ) SUSPENSION
)

**By order of the Oregon Medical Board, the license of Paul Norman Thomas, MD to practice medicine is hereby suspended, effective December 3, 2020, at 5:15 p.m. Pacific Time. As of this date and time, Licensee must stop practicing medicine until further order of the Board.**

1.

The Oregon Medical Board (Board) is the state agency responsible for licensing, regulating and disciplining certain health care providers, including physicians, in the State of Oregon. The Board has the statutory duty under ORS chapter 677 to protect the public and to exercise general supervision over the practice of medicine. Paul Norman Thomas, MD (Licensee) is a licensed physician in the State of Oregon.

This order is made pursuant to 677.205(3), which authorizes the Board to temporarily suspend a license without a hearing when the Board has evidence that indicates that Licensee's continued practice constitutes an immediate danger to the public, as well as ORS 183.430(2), in that the Board has found that Licensee's continued practice of medicine by a physician presents a serious danger to the public health or safety.

2.

When making determinations about unprofessional conduct, negligence and gross negligence in the practice of medicine, the Board relies upon sources that are well recognized in the medical community and are relied upon by physicians in their delivery of care to patients.

Page 1 – *ORDER OF EMERGENCY SUSPENSION* – Paul Norman Thomas, MD

2.1 The Centers for Disease Control and Prevention's "Recommended Child and Adolescent Immunization Schedule for ages 18 years or younger, United States, 2020" (CDC Recommendations) and its predecessors provides a series of vaccinations for children that start at birth and continue through the ages of childhood to provide immunizations for a number of diseases that are potentially debilitating or fatal, to include Hepatitis, Rotavirus, Diphtheria, Tetanus, Pertussis (whooping cough),[1] Polio, Influenza: Pneumococcal pneumonia, Measles, Mumps, Rubella, and a number of other preventable diseases. This schedule has been relied upon for many years, is updated periodically, and is widely accepted as authoritative in the medical community.

2.2 The standard of care in Oregon, as defined by ORS 677.265(1)(c), is "that degree of care, skill and diligence that is used by ordinarily careful physicians in the same or similar circumstances in the community of the physician or a similar community."

3.

Licensee is board certified in pediatrics and addiction medicine and practices medicine in Portland, Oregon. The Board finds that Licensee's conduct has breached the standard of care and has placed the health and safety of many of his patients at serious risk of harm. It is therefore necessary to emergently suspend Licensee's license to practice medicine. The acts and conduct that support this Order for Emergency Suspension follow:

3.1 Licensee has published an alternative vaccination schedule that decreases the frequency of many recommended vaccines and omits others, including rotavirus. Licensee promotes his unique, "Dr. Paul approved" schedule as providing superior results to any other option, namely improved health on many measures, and fraudulently asserts that following his vaccine schedule will prevent or decrease the incidence of autism and other developmental disorders. Licensee uses this claim to solicit parental "refusal" of full vaccination for their children, thereby exposing them to multiple potentially debilitating and life-threatening illnesses, including tetanus, hepatitis, pertussis (whooping cough), rotavirus, measles, mumps, and rubella.

---
[1] DTaP.

Page 2 – ORDER OF EMERGENCY SUSPENSION – Paul Norman Thomas, MD

Licensee's promotion of this alternative vaccination schedule exposes patients to the risk of harm in violation of ORS 677.190(1)(a), as defined by ORS 677.188(4)(a).

    3.2    Licensee is insistent and direct in his communication with parents and guardians that they should accept his alternative vaccine schedule.

        3.2.1    A patient's mother sought subsequent treatment by Provider X after having been "reduced to tears" by Licensee's "bullying" her into his personal vaccine schedule against her express wishes for full vaccination for her child.

        3.2.2    Patient A's mother requested polio and rotavirus vaccinations for Patient A according to CDC Recommendations, but Licensee did not have those vaccines in the clinic, and Patient A would therefore not be able to get them. Patient A's mother reported that the Licensee questioned why she wanted Patient A to get the polio vaccine and asked whether they were traveling to Africa. During the appointment, Licensee continually connected vaccines (not specific) with autism. Licensee asked her how awful she would feel if Patient A got autism and she could have prevented it.

Licensee's false claims regarding the safety of the CDC Recommendations, his failure in following these Recommendations absent unsolicited parental refusal of vaccines, his failure to document any such refusal, and his failure to adequately vaccinate children is grossly negligent in violation of ORS 677.190(13) and exposed his patients to the risk of harm in violation of ORS 677.190(1)(a), as defined in ORS 677.188(4)(a).

    3.3    The Board's review has identified the following cases where Licensee's conduct violated ORS 677.190(1)(a), as defined by ORS 677.188(4)(a), unprofessional or dishonorable conduct which exposed his patients to the risk of harm, as well as gross or repeated acts of negligence in violation of ORS 677.190(13).

        3.3.1    Patient B, an 11-year-old male, was immunized on a delayed schedule according to Licensee's recommendation and practice agreements. Patient B was subsequently diagnosed with pertussis on September 24, 2018, requiring office visits and antibiotics. Pertussis is a fully vaccine-preventable illness. Patient B's chart shows that

Patient B was not immunized, but there are no records of recommendations for immunization or parental refusal of vaccines.

    3.3.2    Patient C is a now 7-year-old male. He was admitted to Randall Children's Hospital in August 2013 at approximately 10 weeks of life with fever and a diagnosis of Kawasaki's disease. Licensee saw Patient C in clinic for three days in clinic with fever. Though Dr. Thomas reevaluated Patient C daily and sent repeated labs, he made a clinical decision to treat a febrile child a less than 3 months old with intramuscular ceftriaxone on the basis of a "bagged" and not catharized urine sample and in the absence of blood cultures. Any child of this age is at higher risk for serious bacterial infection (late onset group B strep, pneumococcal bacteremia, urinary tract infection, pneumonia, meningitis) as well as inflammatory illnesses such as Kawasaki's disease. Licensee breached the standard of care by failing to refer Patient C to the Emergency Room or hospital for definitive lab testing (guided bladder tap, blood cultures done with bedside ultrasound, possible lumbar puncture) and observation. Licensee's management of Patient C's illness in clinic breached the standard of care. Patient C remained non immunized for pertussis and subsequently contracted pertussis when his older brother, Patient C, became ill with pertussis on September 24, 2018.

    3.3.3    Patient D, a now 9-year-old male, was completely non-immunized. Patient D sustained a large, deep scalp laceration at home in a farm setting on August 8, 2017, and was treated with colloidal silver and with his parents suturing the wound independently. Patient D subsequently developed acute tetanus requiring intubation, tracheotomy, feeding tube placement and an almost two- month ICU stay at Doernbecher Children's Hospital. Patient D was then transferred to Legacy Rehabilitation. Licensee saw Patient D for follow-up in clinic on November 17, 2017. Licensee's notes documented a referral to a homeopath, recommendation of fish oil supplements, and "phosphatidyl seine." He did not document an informed consent discussion about the risk/benefit of immunization for a child who had just sustained and still had sequelae of,

and remained vulnerable despite prior infection, to tetanus, a life-threatening and disabling disease that is preventable by proper vaccination. Licensee's care placed Patient D at serious risk of harm and constitutes gross negligence.

3.3.4 Patient E is a 10-year-old female who received minimal immunization in Licensee's clinic. She required hospitalization for rotavirus gastroenteritis in April 2011. This was potentially a vaccine-preventable hospitalization. She also had a severe cough and was treated empirically for pertussis without testing by another physician who was working in Licensee's clinic. The care provided to Patient E in Licensee's clinic breached the standard of care and exposed the patient to the serious risk of harm.

3.3.5 Patient F is a 7-year-old female who Licensee followed in clinic for constipation, food allergies, mold allergies and possible "chronic Lyme disease. Review of her chart from Licensee's clinic reveals that she was nonimmunized. Licensee ordered repeated IgE allergy panels and recommended elimination diets, vitamin supplements and provided antibiotics for acute infections. Licensee failed to provide an appropriate referral to a pediatric gastroenterologist to exclude a diagnosis of malabsorption or celiac disease, a referral to pediatric allergy/immunology or to pediatric nutrition. Licensee's neglect to seek consultative support and oversight, and his failure to address Patient F's lack of immunizations, placed the health of this patient at serious risk and was grossly negligent.

3.3.6 Patient G and Patient H, twins, were born at 35 weeks gestation. They had no chronic medical conditions that would justify medical immunization exemptions. Both Patient G and Patient H became infected with rotavirus gastroenteritis when they were 10 months of age. They were suffering from severe dehydration and serum electrolyte abnormalities and required five days of hospitalization (April 25-30, 2019) at an area children's hospital. Rotavirus infection is fully vaccine-preventable. Licensee's clinic chart contains documentation of parental refusal of vaccines, but they are inconsistent regarding specific vaccines and their timing. In addition, Patient G and

Patient H's mother stated during hospitalization that she thought her children had received rotavirus vaccine. Failure to adequately document specific parental refusal and lack of providing parental clarity constitute acts of negligence.

3.4 Licensee provided a spreadsheet to the Board containing deidentified data describing a study of antibody responses to a single dose of MMR vaccines. Licensee obtained serum antibody levels ("titers") to measles, mumps, and rubella on 905 patients between February 17, 2002, and July 23, 2015. Except for rare cases of suspected immune deficiency, there is no clinical indication for assessment of antibody titers. The ordering of unnecessary testing is a violation of ORS 677.190(1)(a) unprofessional or dishonorable conduct, as defined in ORS 677.188(4)(c) willful and repeated ordering or performance of unnecessary laboratory tests.

3.5 In Licensee's data sheet, 122 patients are identified as having had an inadequate response to the mumps vaccine. Of these, 32 are identified as having received the appropriate second dose of mumps vaccine. The remaining 90 are identified as having received no additional vaccination. Regardless of antibody titers, the standard of care requires a second dose of the recommended MMR vaccination. Licensee failed to ensure these patients were given the required second dose of MMR as soon as he obtained the test results. Knowingly leaving these children inadequately protected against a preventable, potentially debilitating illness constitutes 90 acts of gross and repeated negligence in violation of ORS 677.190(13) and constitutes unprofessional or dishonorable conduct in violation of ORS 677.190(1)(a), as defined in ORS 677.188(4)(a) any conduct or practice which does or might constitute a danger to the health or safety of a patient or the public.

4.

The Board has determined from the evidence available at this time that Licensee's continued practice of medicine would pose an immediate danger to the public and to his patients. Therefore, it is necessary to immediately suspend his license to practice medicine. To do otherwise would subject Licensee's patients to the serious risk of harm while this case remains under investigation.

5.

Licensee has a right to a formal hearing to contest this suspension order. To have a hearing, Licensee must request one in writing. If requested, the hearing will be held pursuant to ORS chapter 183. Licensee has the right to demand the hearing be held as soon as practicable after the Board receives the written request. The written request for hearing must be received within 90 days from the date this order is served on Licensee personally or mailed by certified mail. Licensee will be notified of the time, place and date of hearing. Failure by Licensee to timely request a hearing, failure to appear at any hearing scheduled by the Board, withdrawal of the request for hearing, or failure to appear at any hearing scheduled by the Board on time will constitute waiver of the right to a contested case hearing. In that event, the record of proceeding to date, including Licensee's file with the Board and any information on the subject of the contested case, automatically becomes a part of the contested case record for the purpose of proving a prima facie case per 183.417(4) and this emergency suspension order.

6.

**NOTICE TO ACTIVE DUTY SERVICEMEMBERS**: Active duty Servicemembers have a right to stay these proceedings under the federal Servicemembers Civil Relief Act. For more information contact the Oregon State Bar at 800-452-8260, the Oregon Military Department at 503-584-3571 or the nearest United States Armed Forces Legal Assistance Office through http://legalassistance.law.af.mil. The Oregon Military Department does not have a toll-free telephone number.

IT IS SO ORDERED THIS 4th day of December, 2020.

OREGON MEDICAL BOARD
State of Oregon

KATHLEEN HARDER, MD
BOARD CHAIR