Stephen J. Joncus
Oregon Bar No. 013072
JONCUS LAW P.C.
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
Telephone: (971) 236-1200
Facsimile: (971) 244-7997
steve@joncus.net

*Attorney for Paul Thomas, M.D.*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| Paul Thomas, MD, | Case No. 3:22-cv-944 |
| Plaintiff | |
| v. | |
| Kathleen Harder, MD; Saurabh Gupta, MD; Erin Cramer, PA-C; Robert Cahn, MD; James Lace, MD; Charlotte Lin, MD; Patti Louie, PhD; Jennifer Lyons, MD; Ali Mageehon, PhD; Chere Pereira; Chris Poulsen, DO; Andrew Schink, DPM; Jill Shaw, DO; Eric Brown; Jason Boemmels; and David Farris, MD, | **AMENDED COMPLAINT** |
| Defendants. | Jury Trial Demanded |

<u>**INTRODUCTION**</u>

1.      This case is about the unjustified and malicious destruction of the
medical practice of Plaintiff Paul Thomas, M.D., FAAP, ABAM ("Dr. Thomas") by the
members of the Oregon Medical Board ("OMB" or "Board"). Dr. Thomas is the
founder and owner of Integrative Pediatrics which once had a substantial business with
ten medical providers. Through a series of unlawful actions, Defendants stripped Dr.
Thomas of his license to practice medicine because Dr. Thomas had the temerity to
follow the law and give his patients informed consent.

2.      Through observation and scientific inquiry, Dr. Thomas asked questions
and sought information about the health outcomes of vaccinated children compared to
unvaccinated children. The results of his scientific inquiry demonstrate that children
who receive the full CDC recommended vaccine schedule are much less healthy than
children who do not.

3.      Parents are entitled to information about childhood vaccines so that they
can make their own informed choices about which vaccines their children should take.
Dr. Thomas gave them information based on science data.

4.      To the Board, informed consent with regards to childhood vaccines means
that it is a doctor's responsibility to strong-arm the parents into agreeing to vaccinate
their child in accordance with the Center for Disease Control ("CDC")
recommendations. Due to the Board's subjective attitude about childhood vaccination,

many pediatricians in Oregon will not accept patients whose parents refuse to have their children vaccinated according to the CDC recommendations.

5.      Because Dr. Thomas follows the law and provides his patients with real informed consent that allows parents to make decisions they believe are in the best interests of their child, the Board sought to destroy and silence him. The Board has succeeded in destroying Dr. Thomas' medical practice, his marriage, and his peace of mind.

## PARTIES

6.      Plaintiff Dr. Paul Thomas, M.D., FAAP, ABAM, ("Thomas"), is a graduate of Dartmouth Medical School and has been practicing pediatric medicine for over 30 years. He is the owner Integrative Pediatrics and an individual residing in Washington County, Oregon.

7.      Defendant Kathleen Harder, MD ("Harder") was a member of the Board's Investigative Committee in December 2020 and was the Chair of the Board in December 2020. Harder is still a member of the Board with her term expiring on February 28, 2023. Harder signed the Order of Emergency Suspension dated December 4, 2020. Harder practices internal medicine in Salem, Oregon. Harder ran unsuccessfully in the 2022 primary to be the Democrat Party candidate for Representative in Oregon's 6th Congressional District. Harder is sued in her individual capacity.

8.      Defendant Saurabh Gupta, MD ("Gupta") was a member of the Board in December 2020. Gupta was the Chair of the Board's Investigative Committee in December 2020. Gupta is not currently a member of the Board. Gupta practices cardiology in Portland, Oregon. Gupta is sued in his individual capacity.

9.      Defendant Erin Cramer, PA-C ("Cramer") was a member of the Board in December 2020 and is still a member of the Board with his term expiring February 28, 2025. Cramer was a physician assistant and an athletic trainer. He is now an administrator with the title of Medical Clinics Director for the medical clinics serving the communities of Santiam Hospital. Cramer is sued in his individual capacity.

10.      Defendant Robert Cahn, MD ("Cahn") was a member of the Board and on its Investigative Committee in December 2020. Cahn is now the Chair of the Board and is still on its Investigative Committee although the Board's website states that his term expired February 22, 2022. Cahn is a general surgeon in Portland, Oregon. Cahn is sued in his individual capacity.

11.      Defendant James Lace, MD ("Lace") was a member of the Board in December 2020. Lace is a pediatrician in Salem, Oregon. Lace is sued in his individual capacity.

12.      Defendant Charlotte Lin, MD ("Lin") was a member of the Board and on its Investigative Committee in December 2020. Lin is still on the Board and on its

Investigative Committee with her term expiring February 29, 2024. Lin is sued in her individual capacity.

13. Defendant Patti Louie, PhD ("Louie") was a public member of the Board in December 2020 and is still a member of the Board with her term expiring February 29, 2024. Louie is sued in her individual capacity.

14. Defendant Jennifer Lyons, MD ("Lyons") was a member of the Board in December 2020 with her term expiring February 28, 2022. Lyons is sued in her individual capacity.

15. Ali Mageehon, PhD ("Mageehon") was a member of the Board in December 2020 and is still a member of the Board with her term expiring February 28, 2023. Mageehon is sued in her individual capacity.

16. Defendant Chere Pereira ("Pereira") was a member of the Board as a Public Member in December 2020. Pereira is still a member of the Board with her term expiring February 28, 2023. Pereira was on the Investigative Committee in December 2020. Pereira was an administrator for premedical and predental programs at Oregon State University for 29 years. Pereira is sued in her individual capacity.

17. Defendant Chris Poulsen, DO ("Poulsen") was a member of the Board in December 2020 and was on its Investigative Committee. Poulsen is still a member of the Board and is its Vice Chair. Poulsen is still on the Investigative Committee and is its Chair. Poulsen is practices general emergency medicine in Eugene, Oregon.

Poulsen's rating on one website is two stars out of five. Poulsen is sued in his individual capacity.

18. Defendant Andrew Schink, DPM ("Schink") was a member of the Board in December 2020 with his term expiring February 28, 2021. Schink is sued in his individual capacity.

19. Defendant Jill Shaw, DO ("Shaw") was a member of the Board in December 2020 and is still a member of the Board with her term expiring February 28, 2023. Shaw is sued in her individual capacity.

20. Defendants who were members of the Board in December 2020 are the "2020 Board Defendants."

21. Defendant Eric Brown was an investigator for Board assigned to investigate Dr. Thomas. Brown is sued in his individual capacity.

22. Defendant Jason Boemmels is an investigator for the Board assigned to investigate Dr. Thomas. Boemmels is sued in his individual capacity.

23. Defendant David Farris, MD is the Medical Director for the Board. Farris is sued in his individual capacity.

## JURISDICTION

24. This action arises under federal law, including 42 U.S.C. § 1983 and 1988, to redress the deprivation, under the color of state law, of rights, privileges, and immunities secured to Plaintiffs by the Constitution of the United States.

25.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343. This Court has personal jurisdiction over the Defendants because they have committed acts in this district that violate the rights of Plaintiffs protected by the Constitution and laws of the United States. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

26.     Dr. Thomas seeks damages for the violation of his rights under the United States Constitution.

## BACKGROUND

27.     Dr. Thomas is the oldest child of missionaries with the United Methodist Church. When he was 5, his family moved from the United States to Africa, and he grew up in Rhodesia, now called Zimbabwe, in the 1960's. His family's home in the village of Arnoldine, was built out of sun-dried bricks, had no running water, no electricity, and no glass windows.

28.     Dr. Thomas' mother was a nurse, and their home became the de facto health center for the village. By the time Dr. Thomas was in his teens, he had seen more deaths than most Americans will see in their lifetimes. It was not uncommon for mothers and their babies to die during childbirth. Newborns, especially those with malnourished mothers, succumbed to infectious diseases. These experiences inspired Dr. Thomas' ambition to become a pediatric doctor to make it his life's work to promote the health of children.

29.     Dr. Thomas received his medical degree from Dartmouth Medical School. When he was a resident, the Hib vaccine was first introduced for a strain of bacteria, *Haemophilus influenzae* type B, that can cause severe infections like meningitis and death, especially in small children. At that time, children's hospitals had several cases of meningitis at any given time. In the first year the improved Hib vaccine was introduced, in 1987, rates of pediatric meningitis at his hospital dropped by half. Before the Hib vaccine about twenty thousand children under five came down with life-threatening infections caused by *Haemophilus influenzae* type B every year and about a thousand died. These days there are fewer than twenty-five cases of Hib a year and no deaths.

30.     Vaccines are complex products. Each vaccine contains many ingredients, ranging from 8 to 32 different ingredients, making them among the most complex pharmaceutical products.

31.     Vaccines are administered to healthy people. In contrast, pharmaceuticals are primarily given to sick people. The poor health of a sick person means that there is a reason to accept risk of damage from the pharmaceutical in exchange for the benefit provided by the pharmaceutical. In contrast, the acceptable level of risk in administering a vaccine is much lower because the person is healthy.

32.     The first principle of being a doctor is first do no harm. This principle comes into sharp relief when recommending the vaccines that should be taken from birth to adulthood.

33.     Vaccines are also given predominantly early in life when the patient has barely begun life and has a lenghty life expectancy. In contrast, pharmaceutical use becomes more extensive as patients get older and use accelerates near the end of life. Damage to a patient's health caused by a medicine at the initial stages of life that may last for their lifetime is much more significant than damage caused by a medicine administered nearer to the end of a patient's life.

34.     In view of the foregoing factors, the rational approach is to subject vaccines to the most rigorous testing standards prior to approval. But the opposite is true.

35.     Vaccines are classified as biologics thus allowing their ingredients and the finished vaccine product to be untested or tested minimally before being brought to market.

36.     The vaccine industry is rife with conflicts of interest. The CDC which recommends the vaccine schedule for the population of the United States, holds 54 vaccine patents. The vaccine companies employ a who's who of former government officials that used to be responsible for regulation of the vaccine companies. High office holders in the government are often plucked from the vaccine companies, where they

will return after having served their purpose steering government policy in favor of the vaccine companies.

37.     Product liability law, which is the primary method of policing unsafe products in the marketplace, has been eliminated for childhood vaccines. The National Childhood Vaccine Injury Act of 1986 gave the vaccine manufacturers immunity from liability for their products.

38.     Unshackled by the risk of product liability lawsuits, the number of vaccines for children has increased dramatically since the National Childhood Vaccine Injury Act of 1986. Over the same period, the state of children's health in the United States has degraded significantly.

39.     In 1983, the CDC recommended a total of 11 total shots for children, spaced out between the ages of two months and sixteen years, to protect against seven diseases.

40.     In 1986, Congress passed the Vaccine Act that gave blanket immunity to vaccine companies for injuries cause by vaccines.

41.     In 1988, about 12.8% of children had chronic disease.[1]

42.     In 2017, the CDC recommended a total of 53 shots beginning in the first hours of life through age sixteen, to protect against sixteen diseases.

---

[1] Anthony R Mawson, et al, *Pilot comparative study on the health of vaccinated and unvaccinated 6- to 12-year-old U.S. children*, J. Transl. Sci. 3: DOI: 10.15761/JTS.1000186.

43.     In 2011, about 54% of children have chronic disease.

44.     The earliest studies of the prevalence of autism found only 2 to 4 cases of autism in 10,000 children.

45.     Today, the CDC estimates that one in every forty-five American children has an autism spectrum disorder.

46.     Dr. Thomas has been practicing medicine for over 30 years. Dr. Thomas is a diplomate of the American Board of Addiction Medicine. Dr. Thomas was a board-certified fellow of the American Academy of Pediatrics, passing all recertification exams and requirement for 30 years until the Board's actions triggered the American Academy of Pediatrics to revoke his board certification in 2021.

47.     In the Fall of 1988, Dr. Thomas began practicing medicine at Emanuel Children's Hospital in Portland, Oregon. As the years went by in his practice, he noticed that children who followed the advice for vaccination were not as healthy as they should have been. By the late 1990's and into the 2000's he noticed an increase in chronic diseases and other conditions including food allergies, attention deficit disorders, childhood anxiety, childhood asthma, childhood depression, eczema, gastroesophageal reflux, headaches, ear infections, neurological disorders, sinus infections, lung infections like pneumonia, urinary tract infections, virulent strep throat, to name a few.

48.     Most significant has been the devastating rise in autism. The rise in autism is impossible to ignore. When Dr. Thomas was in medical school from 1981 through 1985, autism was rarely seen. Dr. Thomas saw only a couple of mild cases of autism while in residency during 1985 through 1988. By the time that Dr. Thomas was working at as a pediatrician at Westside Pediatrics in the late 1990's and early 2000's, he was sending one child almost every month to a specialist for suspected neurological disorders.

49.     It became obvious to Dr. Thomas that some environmental factor or combination of factors was negatively affecting the health of the children in his care.

50.     Dr. Thomas also came to realize that the recommendations that are made today do not seem to add up when one looked at the science—or the lack of science.

51.     In 2003, the facts finally overwhelmed Dr. Thomas. While listening to multiple presentations at a medical conference about autism, he realized that the CDC schedule of recommended vaccines was poisoning children with mercury. No one from the CDC had ever calculated the cumulative amounts of mercury in the childhood vaccine schedule at the time.

52.     Dr. Thomas later discovered that the CDC made the same mistake with aluminum. The current CDC-recommended childhood vaccine schedule exceeds the toxic limits of safe aluminum exposure.

53.     Parents have a legal right to choose whether and how their children are vaccinated. Parents are entitled to information so that they can make an informed choice. The recommended CDC schedule has been transformed into mandatory requirements in states such as Oregon where the medical boards refuse to accept any questioning of their vaccine dogma.

54.     This case is a particular example of how the Board and its individual members sought to destroy Dr. Thomas because he asked questions and failed to blindly follow the Board's agenda seeking to make sure that all children are injected with all the CDC recommended vaccines.

55.     Dr. Thomas has shown, with peer reviewed scientific inquiry, that children who do not follow the CDC recommended vaccine schedule are much healthier than fully vaccinated kids. For the sin of following the science and revealing truth, the Board engaged in a campaign to punish Dr. Thomas. In its zeal to crush opposing views, the Board succeeded in destroying Dr. Thomas' medical practice, marriage, and peace of mind.

56.     In 2008, Dr. Thomas opened his own clinic, Integrative Pediatrics, where he has served over 11,000 pediatric patients.

57.     In August 2016, Dr. Thomas published his book, "The Vaccine-Friendly Plan: Dr. Paul's Safe and Effective Approach to Immunity and Health—from Pregnancy Through Your Child's Teen Years." His book discusses his alternative vaccine schedule

based on his experience from his pediatric practice, as well as data from other credible and scientifically minded medical doctors.

58.     Dr. Thomas points out in his book that the most important thing to protect in children is their developing brain.

59.     The CDC estimates that today, one in every forty-five American children has an autism spectrum disorder. This along with other brain-related problems have increased dramatically in parallel with the dramatic increase since 1986 in the number of vaccine shots that the CDC recommends.

60.     A natural scientific observation, given the in autism and other disorders that track with the rise in childhood vaccination since 1986, is to question whether the vaccines are poisoning children's brains at the time when they are the most vulnerable.

61.     Mercury is cytotoxic, neurotoxic, immune toxic and nephrotoxic. Due to its ability to cross the blood brain barrier mercury is especially toxic to brain tissue.

62.     The National Research Council (NRC) recommended a maximum daily exposure of 0.1 micrograms of methylmercury per kilogram per day. The CDC allowed more: 0.3 micrograms per kilogram per day; the FDA allowed even more: 0.4 micrograms per kilogram per day.

63.     In a conference in 2003, Dr. Thomas did the math. The vaccines given to a 2-month-old baby amounted to 62.5 micrograms of mercury who might weigh 5

kilograms. This is 125 times the NRC's safety limit; 42 times the CDC's safety limit; and 31 times the FDA's safety limit.

64.     Although the government never admitted that there was a problem based on these revelations, the vaccine manufacturers voluntarily reduced the amount of mercury in their vaccines. To this day the U.S. government and public health officials deny that there was too much mercury in pediatric vaccines. A lesson from this episode is that there is a legitimate reason to believe that the government cannot be trusted to properly regulate vaccines to protect children.

65.     Aluminum is a neurotoxin that in sufficient amounts will impair neurological development and cause cognitive difficulties.

66.     The FDA guideline states that 4 to 5 micrograms per kilogram per day will cause aluminum to accumulate at levels associated with central nervous system toxicity. For a 4 kilogram newborn this corresponds to 16 to 20 micrograms of aluminum as, what is perhaps, a safe limit.

67.     The hepatitis B vaccine recommended to be given to every newborn has 250 micrograms of aluminum or about 15 times of what might be a the safe limit.

68.     On top of that, most newborns have no risk of contracting hepatitis B. Hepatitis B is a sexually transmitted disease that is transmitted through intimate sexual contact or through drug abuse utilizing needles. Newborns have no chance of catching hepatitis B unless they are born to a mother who is hepatitis B positive.

69.     Giving the hepatitis B vaccine to a newborn violates the principle of first do no harm because there is no benefit (except when the mother is hepatitis B positive) and can create harm. Yet, government authorities, including the Board, blindly demand obedience to the CDC schedule.

70.     Dr. Thomas' book, "The Vaccine-Friendly Plan: Dr. Paul's Safe and Effective Approach to Immunity and Health-from Pregnancy Through Your Child's Teen Years"[2] discusses Dr. Thomas' alternative vaccine schedule based on results from his pediatric practice and information from other credible and scientifically minded medical doctors. To date Dr. Thomas' book has sold more than 100,000 copies.

71.     As described in his book, for the more than 1,000 children born into Dr. Thomas' practice who followed his vaccine-friendly plan there were no cases of autism. Other doctors around the country with similar protocols also saw excellent results.

72.     In contrast, for those who presumably follow the advice of mainstream pediatricians—the recommended CDC vaccine schedule—one in forty-five children are diagnosed with autism. The difference in outcomes between Dr. Thomas' patients and other children is stark and sobering. Autism is a significant life-changing impairment that lasts a lifetime. The dramatic increase since 1986 in rate that autism strikes our children is a national tragedy. That this dramatic increase appears to be caused by vaccines intended to protect children is sickening.

---

[2] Incorporated to this Complaint by reference.

73.     If you were a parent, would you not want to know that one in forty-five children following the CDC schedule become autistic, while zero in 1,000 children who followed the vaccine-friendly plan became autistic? Dr. Thomas wants to inform his patients of these facts. What choice would you make knowing these facts? The Board wants to silence Dr. Thomas so that Oregon citizens will not be informed of these facts.

**Oregon Medical Board's Campaign Against Dr. Thomas**

74.     Dr. Thomas published his "Vaccine-Friendly Plan" in 2016. Starting in December 2018, the Board began its campaign aimed at damaging Dr. Thomas' medical career and reputation. Since December 2018, OMB has been focused on its intent to find something to put Dr. Thomas out of business. The reason that the Board is singling out Dr. Thomas because he dares to give parents factually accurate information about the risks of the childhood vaccines. For that, the Board is hellbent on ruining him.

75.     On or about December 26, 2018, the Board sent a letter to Dr. Thomas claiming that it was investigating a "complaint" about care he provided to a child. The Board did not identify who made the complaint or what prompted the investigation. In fact, Dr. Thomas *never treated the child*.

76.     Yet, under the guise of legal authority, the OMB used this initial "complaint" about a child never treated by Dr. Thomas to harass and burden Dr.

Thomas and his medical practice by issuing numerous overly broad demands for patient records. Despite the unreasonable nature of the OMB's records requests, Dr. Thomas complied in good faith and, in doing so, provided the OMB with a voluminous number of records that included hundreds of patient names. To Dr. Thomas' knowledge, the OMB never initiated formal disciplinary proceedings against him in relation to the child involved in the initial "complaint" it purportedly received.

77.     On or about July 23, 2020, the OMB sent a letter to Dr. Thomas notifying him that the OMB received another "complaint" alleging Dr. Thomas engaged in unethical "human medical research" when for a study titled, "Can Integrative Medicine approaches and a selective vaccination schedule impact the health and rates of autism in a general pediatric population?" Again, the OMB did not reveal who made the complaint or what prompted this investigation.

78.     But Dr. Thomas had received a regulatory opinion in 2015 from the Western Institutional Review Board ("WIRB") stating that the research that Dr. Thomas was planning to perform was permitted under the law. It was permitted because it involved existing documents and the data utilized would be devoid of any identifying information linked to the identity of the patients.

79.     In early 2019, the Board asked Dr. Thomas to show that his vaccine-friendly plan was better than the CDC recommended schedule.

80.     Dr. Thomas then initiated an analysis of the population of his patients and the health outcomes as a function of vaccination status. The patient data was collected an anonymized. James Lyons-Weiler, an expert in data analysis, performed the analysis. The analysis showed that unvaccinated children were much healthier than vaccinated children. Figure 5 is a dramatic depiction of how much healthier unvaccinated children are compared to vaccinated children.



**Figure 5.** Analysis 5. Cumulative office visits in the vaccinated (orange) vs. unvaccinated (blue) patients born into the practice: the clarity of the age-specific differences in the health fates of individuals who are vaccinated (2763) compared to the 561 unvaccinated in patients born into the practice over ten years is most strikingly clear in this comparison of the cumulative numbers of diagnoses in the two patient groups. The number of office visits for the unvaccinated is adjusted by a sample size multiplier factor (4.9) to the expected value as if the number of unvaccinated in the study was the same as the number of vaccinated.

81.     This is exactly the information the Board asked Dr. Thomas to produce. But the answer did not comport with the Board's dogmatic opinion. On December 3, 2020, a few days after Dr. Thomas' peer-reviewed paper became available online, the Board's Investigative Committee met. Harder reviewed the case for the Investigative Committee which then forwarded the case to the full Board for action. On that same day, December 3, 2020, the full Board met. All eleven Board members who were present voted to suspend Dr. Thomas' license to practice medicine on an emergency basis.

82.     The Board suspended Dr. Thomas license on the basis that he was a danger to the public. To the contrary, Dr. Thomas and his scientific results are a danger to the Board and to their dogmatic adherence to the CDC schedule. The supposed scientists and bureaucrats at the Board were not interested in science—they were interested in forcing compliance with the accepted dogma.

**The Board violated Oregon Statute for Suspension of Dr. Thomas' License**

83.     Pursuant to ORS 677.205(3), "the board may temporarily suspend a license without a hearing, <u>simultaneously with the commencement of proceedings under ORS 677.200</u> if the board finds that evidence in its possession indicates that a continuation in practice of the licensee constitutes an immediate danger to the public."

84.     But the Board violated ORS 677.205(3) by issuing an emergency suspension without simultaneously commencing proceedings. The Board did not issue

a notice of proposed disciplinary action or other form of written complaint as required under ORS 677.200 until April 22, 2021, nearly five months after the emergency suspension order.

85.     The Board's actions in Dr. Thomas' case are in direct violation of the Board's rules and the Administrative Procedures Act. The effect of the Board's unlawful action was to harm Dr. Thomas' reputation in the public while denying him the protections of a formal disciplinary proceeding, including his right to obtain and review the Board's investigatory file in preparing his defense.

86.     OMB had absolutely no justification for issuing an emergency suspension order because, for one thing—there was no emergency. In imminent threat to public safety and welfare existed.

87.     The CDC's vaccine recommendations are just that—recommendations. But the Board treats these recommendations as requirements. Any physician who disagrees with the CDC recommendations is a danger to the public according to the Board.

88.     But it is the Board that is the danger to the public. Its insistence on absolute fealty to the CDC recommendations is anti-science.

89.     Knowledge about the world is gained through the scientific method. The scientific method is a systematic approach to discovering new information about the

material world. It involves observation, forming a hypothesis, testing the hypothesis, interpreting the test results, and reaching a conclusion.

90. The nature of science is to question. "The important thing is to not stop questioning." Albert Einstein. "The scientist is not a person who gives the right answers, he's one who asks the right questions." Claude Lévi-Strauss.

91. "In questions of science, the authority of a thousand is not worth the humble reasoning of a single individual." Galileo Galilei

92. Knowledge about childhood vaccines cannot progress when questioning the safety of the CDC recommendations is considered so dangerous that even venturing into the facts is too great a risk.

93. Dr. Thomas published facts that question the safety of the CDC recommendations. By trying to silence Dr. Thomas, the Board overreached its statutory authority in an effort to stop the progress of knowledge acquired through sound scientific methods.

94. By trying to silence Dr. Thomas, the Board is trying to take away the rights of parents to informed consent. The Board wants to limit the spread of knowledge that contradict the official narrative and to strip parents of access to information that contradicts the Board.

95. The Board has no science backing its contention that the CDC recommendations are safe because the CDC recommendations have never been tested

as a whole. In contrast Dr. Thomas' alternative schedule has been tested as a whole. And the results are extremely positive. For example, as cited in his book, not a single patient out of more than a 1,000 following Dr. Thomas' vaccine schedule has been diagnosed with autism.

96.     The factual grounds given by the Board for its suspension of Dr. Thomas' license were frivolous, full of falsehoods, and failed to meet the threshold of an imminent threat to public welfare and safety.

97.     <u>Patient A</u>. The Board alleged a dispute with a patient's mother that never actually happened. Dr. Thomas saw the patient only twice in 2013 and denies the Board's claim. The Board falsely alleged that Dr. Thomas failed to document the patent's declination of vaccination for Patient A. None of the Board's allegations with regard to the alleged dispute in 2013 supports a finding that an imminent threat to public safety existed.

98.     Accordingly, the Board had no grounds for discipline of Dr. Thomas due to his interactions with Patient A.

99.     <u>Patient B</u>. Patient B was diagnosed with pertussis in September 2018 and was successfully treated with office visits and antibiotics. The Board's allegations failed to set forth specific reasons why Dr. Thomas' alleged conduct constituted a violation of the Oregon Medical Practice Act and how such a violation rose to the level of an immediate danger to public welfare and safety. According to the Board, the conduct

occurred in September 2018. The Board failed in its duty to substantiate how such

conduct that allegedly occurred two and one half years prior to the Board's issuing a

summary suspension of Dr. Thomas' medical license constitutes an immediate danger

to the public.

100.    The Board's allegations concerning Patient B make it sound like Dr.

Thomas' has a prerequisite for new patients, that new patients must commit to

accepting a delayed vaccination schedule. This impression created by the Board's

description is false. Dr. Thomas provides parents with facts—it is their choice how they

want to vaccinate their children.

101.    The Board alleged that there were no records of parental refusal of

vaccines for Patient B. To the contrary, the records for Patient B show that his parents

declined vaccination for pertussis on April 2, 2014, August 19, 2015, and April 15,

2020. The parents of Patient B had the authority to decline the pertussis vaccination

and they did decline the pertussis vaccination. The Board's allegation was false.

102.    The Board alleged that pertussis is a fully vaccine-preventable illness. The

Board's allegation was false.

103.    The Board had no grounds for discipline of Dr. Thomas due to his

interactions with Patient B and certainly no legal grounds to issue a summary

suspension of Dr. Thomas' medical license.

104.  Patient C. The Board falsely asserts that Patient C was diagnosed with Kawasaki Disease in August 2013. When Patient C was admitted to the hospital, the treating physician said that they did not know whether Patient C had Kawasaki Disease.

105.  The Board intentionally exaggerated its allegations concerning Patient C. Patient C was appropriately treated in a timely manner by Dr. Thomas. Patient C's parents are completely happy with the treatment that their son received from Dr. Thomas.

106.  The events relied by the Board regarding Patient C occurred in 2013—seven years before the Board issued an emergency suspension of Dr. Thomas' medical license.

107.  Patient C is also not vaccinated, a choice made by his parents and properly documented by Dr. Thomas.

108.  The Board had no grounds for discipline of Dr. Thomas, and summary suspension of his license, due to his interactions with Patient C.

109.  Patient D. At six years of age, Patient D was a completely unvaccinated boy who sustained a forehead laceration, was stitched up at home, and developed tetanus. Patient D spent almost 2 months in the ICU at Doernbecher Children's Hospital. By merely including Patient D in its emergency order the Board deceptively conveyed that Patient D was Dr. Thomas' patient before his injury. Patient D was not

Dr. Thomas' patient before the injury. The Board's deceptive description was designed to intentionally create a false impression.

110.    Patient D was not seen by Dr. Thomas until *after* Patient D was discharged from the hospital. Omitting this critical fact amounts to a fraudulent misrepresentation by the Board.

111.    Also not disclosed by the Board is the reason that Dr. Thomas saw Patient D was because other doctors would not accept Patient D because his parents adamantly refused to vaccinate him. During Patient D's first visit with Dr. Thomas in 2017, the parents made it clear to Dr. Thomas that they would refuse all vaccinations. There was no basis for any discipline of Dr. Thomas related to Patient D. The Board's allegations against Dr. Thomas based on Patient D demonstrates the apparent desperation of the Board to charge Dr. Thomas with something—anything.

112.    Patient E. Patent E became hospitalized with rotavirus gastroenteritis in April 2011, that the Board contends could have been preventable by vaccination. But, the refusal by the parents of Patient E to vaccinate their daughter was documented by Dr. Thomas.

113.    The Board's conclusion that Dr. Thomas breached the standard of care for Patient E boils down to an indictment against Dr. Thomas because he respected the parents' right to informed consent. By sanctioning Dr. Thomas, the Board ignores the law that it is the parents' right to refuse vaccination. The Board found Dr. Thomas

unfit for duty because Dr. Thomas refuses to violate Oregon law requiring him to

obtain informed consent. The Board's allegations were false.

114.    The Board had no grounds for discipline of Dr. Thomas due to

interactions with Patient E, and no legal grounds to issue a summary suspension of Dr.

Thomas' medical license.

115.    Patient F. The Board lists ailments suffered by Patient F, but none of

those ailments are targeted by any childhood vaccine. The Board next says that Patient

F was unvaccinated. These non sequiturs were designed by the Board to falsely create

the impression that Patient F's ailments were due to non-vaccination. They accuse Dr.

Thomas of failing to address Patient F's lack of vaccination. But Patient F's parents

declined vaccination in November 2013, January 2014, July 2014, November 2014,

January 2017, December 2017, January 2019, and August 2020. The Board's allegations

were false. Again, the Board is punishing Dr. Thomas for following the law by

practicing informed consent.

116.    The Board's remaining assertions about Patient F are unrelated to

vaccination. Patient F was referred to Dr. Thomas to obtain an IgE allergy testing and

he performed those tests. Dr. Thomas' treatment of Patient F considered things that

most other doctors do not consider because they do not keep up on the science. Far

from negligent, Dr. Thomas treatment of Patient F was exemplary.

117.    The Board had no grounds for discipline of Dr. Thomas due to interactions with Patient F and violated his due process rights by issuing an emergency suspension of his medical license.

118.    <u>Patients G and H</u>. The Board's emergency suspension alleged that Dr. Thomas was negligent in advising the parents of twins, Patient G and Patient H. The twins were hospitalized with rotavirus gastroenteritis when they were 10 months old in April 2019. The Board alleged that the mother of Patient G and Patient H believed that her twins had received the rotavirus vaccine. The Board alleged that Dr. Thomas inadequately documented the vaccination decisions of the parents and failed to provide clarity to the parents. In fact, the parents made their own decision not to vaccinate their children. The Board's allegations are false. The Board knew that the allegations were false or was reckless as to the truth when it made these allegations. The Board intended to harm Dr. Thomas with these false allegations.

119.    The Board had no grounds for discipline of Dr. Thomas due to interactions with Patients G and H, much less the emergency discipline that he received.

120.    The MMR vaccine is directed towards measles, mumps, and rubella. After one dose of the MMR vaccine, about 90 to 95% of children do not need a second dose of the MMR vaccine. It is therefore prudent to test for immunity prior to administering a second MMR shot that most kids do not need. Indeed, testing is the only ethical

thing for a doctor to do because there are risks to vaccination and it is unprofessional to administer unnecessary treatment. Moreover, parents have the right to request antibody testing and parents have the right to refuse a second dose of the MMR vaccine regardless of whether the first dose conferred immunity.

121.     In the Board's upside-down worldview, it determined that Dr. Thomas was guilty of unprofessional or dishonorable conduct for obtaining immunity tests for measles, mumps, and rubella for 905 patients between 2002 and 2015.

122.     Of the 905 patients, 90 had low immunity response and did not get a second dose of the MMR vaccine. The Board bizarrely found Dr. Thomas responsible for not ensuring these 90 patients were given the second MMR dose. The Board's finding is in direct contravention of law. It is not Dr. Thomas' job to ensure that these patients get a second MMR dose. That is the opposite of Dr. Thomas' job under Oregon law. Dr. Thomas' job is to give information to parents so that they make an informed choice. These children do not belong to Dr. Thomas and they do not belong to the Board. It is the parent's choice whether their children receive any vaccination. Neither the Board, nor Dr. Thomas get to make decisions for parents.

123.     The Board had no grounds for discipline of Dr. Thomas for obtaining immunity tests for Measles, mumps, and rubella for 905 patients, much less the emergency discipline that he received.

124.     Under normal circumstances, the investigation would have proceeded confidentially, behind closed doors. Once the Board was ready, and the matter thoroughly investigated, it would have issued a proposed notice of discipline. Dr. Thomas could demand a fair hearing and the Board would file the notice and ONLY THEN the allegations would be made public.

125.     Instead, the Board issued a false emergency notice based on lies, suspending Dr. Thomas' license on an emergency basis based only upon alleged incidents that were many years old. But by making the emergency suspension public, the Board let the media run rampant, republishing all the false claims over and over again, severely damaging Dr. Thomas.

126.     After much damage was done by the emergency suspension on December 4, 2020, the Board dropped its claims as to four of the seven individuals when filed its Complaint on April 22, 2021.

127.     Since the emergency suspension, Defendants continue to try to scour the earth for material to charge Dr. Thomas. Dr. Thomas has been subjected to one investigatory letter after another. Defendants seek to find some nuggets that they can twist to justify their campaign to ruin Dr. Thomas.

128.     The Federation of State Medical Boards ("Federation") is a secretive, private, and powerful organization located in Texas. The Federation is not transparent and is unaccountable to the public. The Federation claims to represent the state

medical boards in the United States and support them. In fact, the Federation wields

an enormous about of power over the practice of medicine in all 50 States.

129.    The Federation is funded and controlled by big pharmaceutical

companies. According to poll data, Big Pharma is the least trusted industry. The

Federation serves to whitewash Big Pharma's narrative and control the state medical

boards to the benefit of Big Pharma. The Federation does the bidding of Big Pharma.

For example, the Federation played a major role in the disastrous opiate crisis.

130.    Led by Purdue Pharma, the maker of Oxycontin, opiate manufacturers

gave almost $2 million to the Federation. During the time this money was pouring in,

the Federation wrote new guidelines for opiate prescribing, in which it explained that

what looked like addiction was not really addiction. The guidelines included this

statement: "Millions of Americans suffer from debilitating pain – a condition that, for

some, can be relieved through the use of opioids."

131.    The Federation pressured medical boards to adopt the new guidelines. It

created continuing medical education courses to teach doctors to prescribe more

opioids to their patents. It sought to reassure doctors that following the new guidelines

would reduce the likelihood of disciplinary action. Indeed, the Federation encouraged

state medical boards to discipline doctors for the undertreatment of pain.

132.    The Federation also promoted a book titled "Responsible Opioid

Prescribing" based on its guidelines designed to encourage the broad use of opioids for

non-terminal patients. The Federation encouraged the overprescribing and worsening of the opioid addiction. A four-fold increase in prescribing opioids was associated with a four-fold increase in opioid related overdose deaths.

133.     The Federation was a primary purveyor of misinformation about opiates that caused a man-made epidemic of addition and death. The opioid epidemic was caused by an industry-funded campaign to encourage opioid prescribing in which the Federation had a prominent role.

134.     The Federation promotes whatever is in the interests of Big Pharma. It is part of the cartel of entities that banded to together to falsely assert that the COVID-19 vaccines were safe, effective, and necessary. It labels as "misinformation" anything that would create public hesitancy in taking a vaccine, including childhood or COVID vaccines. To the Federation, "misinformation" about vaccines represents any statement or scientific evidence that differs from the prevailing narrative of stakeholders who most stand to profit from vaccines. The Federation encourages state boards to discipline any doctor who shares information contrary to the benefit of the pharmaceutical companies.

135.     The Federation has undue influence over the discipline of doctors by the state medical boards. It publishes the Guide to Medical Regulation in the United States. Guidance on physician discipline from the Federation become de facto

requirements to state medical boards. The Federation publishes a quarterly journal titled "Journal of Medical Regulation."

136.    The Oregon Medical Board has close ties to the Federation. The Oregon Medical Board routinely reports physician discipline to the Federation. The Board's Executive Director was a member of a Federation workgroup on the discipline of doctors in 2018. Representatives of the Federation traveled to Oregon to give a presentation to the Board in January 2018. According to the Board, the Federation is an innovative leader that is shaping the future of medical regulation.

137.    It is a priority of the Federation to see that doctors who question the safety of childhood vaccines are disciplined. On information and belief, the Federation targeted Dr. Thomas for discipline. The Board is heavily influenced by the Federation. The Board is under pressure to resolve a question of science in what they perceive to be the prevailing medical view as dictated by the Federation. On information and belief, the Board was under pressure from the Federation to discipline Dr. Thomas.

## FIRST CLAIM FOR RELIEF

### VIOLATION FREEDOM OF SPEECH UNDER
### 1ST AMENDMENT to the UNITED STATES CONSTITUTION

### (42 U.S.C. § 1983)

138.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

139.    Dr. Thomas enjoys a constitutionally protected right to freedom of speech. Dr. Thomas' constitutionally protected free speech right may not be impaired by Defendants.

140.    Dr. Thomas has a free speech right to publish his research on the health effects of childhood vaccines. Dr. Thomas has a free speech right to inform his patients of the benefits and risks of childhood vaccines. Dr. Thomas' right to free speech is a fundamental right protected by the United States Constitution.

141.    There is no law in Oregon allowing the Board to regulate the content of Dr. Thomas' speech to his patients. The is no law in Oregon concerning the content of physician speech regarding vaccines. Without any authority, the Board is imposing its own view of what a physician may say to his patients regarding vaccines. By disciplining Dr. Thomas for explaining the pro and cons of childhood vaccines, the Board seeks to control the content of Dr. Thomas' speech with his patients. The Board is not permitted under the United States Constitution to impose content-based restrictions on Dr. Thomas' professional speech with his patients.

142.    By taking disciplinary actions against Dr. Thomas and by continuously investigating him, Defendants are illegally seeking to silence Dr. Thomas from speaking the truth about childhood vaccines with his patients in violation of the First Amendment.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF PROCEDURAL DUE PROCESS UNDER
### 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION
### (42 U.S.C. § 1983)

#### UNAUTHORIZED LICENSE SUSPENSION

143.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

144.    Medical licensure is a property interest. Dr. Thomas has a property interest in his medical license.

145.    The 2020 Board Defendants failed to follow the statutory process to suspend Dr. Thomas' medical license. By failing to follow the Oregon Medical Practice Act's statutory process required to issue a summary suspension against Dr. Thomas' medical license, the 2020 Board Defendants exceeded their statutory authority in violation of Dr. Thomas' due process rights.

146.    The Board only has the power that is granted to it by the legislature. It cannot exercise any authority outside of the statutory authority granted to it by the Oregon legislature. The 2020 Board Defendants did not have the power to suspend Dr. Thomas' without following the procedure specified by the Oregon legislature.

147.    By bypassing the statutorily mandated process and arrogating to themselves the implementation of a procedure that state law denies them, the 2020 Board Defendants did not serve in a judicial capacity that confers absolute immunity.

148.    An essential principle of due process is that an individual be given an opportunity for a hearing prior to deprivation of any significant property interest. This principle is so well established as the norm that reasonable Board Members would have known it.

## THIRD CLAIM FOR RELIEF

### VIOLATION OF PROCEDURAL DUE PROCESS UNDER 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

### FABRICATION OF EVIDENCE

149.    Defendants Brown was an investigator who wrote false and misleading allegations against Dr. Thomas. On information and belief, Brown was managed by Farris.

150.    On information and belief Boemmels was an investigator who wrote false and misleading allegations against Dr. Thomas. On information and belief, Boemmels was managed by Farris.

151.    Neither Brown nor Boemmels actually interviewed the individuals cited in their report. They instead relied on second-hand information which ws then used to violate Dr. Thomas' due process rights.

152.    When the power of the government is used against an individual, the individual has a right to a fair procedure for that action.

153.    Fabrication of evidence is the epitome of an unfair procedure. Defendants Brown and Boemmels violated Dr. Thomas' constitutional right to due process.

154.    By fabricating evidence against Dr. Thomas, Brown and Boemmels, government employees, engaged in an unfair procedure through utilization of the power of government, in violation of Dr. Thomas' due process rights.

## FOURTH CLAIM FOR RELIEF

### VIOLATION OF PROCEDURAL DUE PROCESS UNDER
### 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

### SUPERVISORY LIABILITY

155.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

156.    On information and belief, Farris participated in or directed the fabrication of evidence by Brown and Boemmels. In the alternative, on information and belief, Farris knew of the fabrication of evidence and failed to act to prevent it. Farris knew or reasonably should have known that the fabrication of evidence against Dr. Thomas was a violation of his due process rights.

157.    On information and belief, Harder knew of the fabrication of evidence and failed to act to prevent it.

158.    On information and belief, Gupta knew of the fabrication of evidence and failed to act to prevent it.

159.    On information and belief, Cramer knew of the fabrication of evidence and failed to act to prevent it.

160.    On information and belief, Cahn knew of the fabrication of evidence and failed to act to prevent it.

161.    On information and belief, Lace knew of the fabrication of evidence and failed to act to prevent it.

162.    On information and belief, Lin knew of the fabrication of evidence and failed to act to prevent it.

163.    On information and belief, Louie knew of the fabrication of evidence and failed to act to prevent it.

164.    On information and belief, Mageehon knew of the fabrication of evidence and failed to act to prevent it.

165.    On information and belief, Pereira knew of the fabrication of evidence and failed to act to prevent it.

166.    On information and belief, Poulsen knew of the fabrication of evidence and failed to act to prevent it.

167.    On information and belief, Schink knew of the fabrication of evidence and failed to act to prevent it.

168.    On information and belief, Shaw knew of the fabrication of evidence and failed to act to prevent it.

169.     By acting in a supervisory capacity and either fabricating or overseeing the fabrication of evidence against Dr. Thomas, Defendants Farris, Harder, Gupta, Cramer, Cahn, Lace, Lin, Louie, Mageehon, Pereira, Poulsen, Schink, and Shaw engaged in the violation of Oregon statutory law and the United States Constitution. Such conduct violated Dr. Thomas' due process rights.

### FIFTH CLAIM FOR RELIEF

**VIOLATION OF PROCEDURAL DUE PROCESS UNDER
14TH AMENDMENT TO THE UNITED STATES CONSTITUTION
(42 U.S.C. § 1983)**

**UNCONSTITUTIONALLY VAGUE STATUTE**

170.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

171.     The Board relied on ORS 677.190(1)(a) which purports to give the Board power to suspend a license for unprofessional and dishonorable conduct, which is defined in ORS 677.188(4) as any conduct which might constitute a danger to the health or safety of the public.

172.     Dr. Thomas treated his pediatric patients by providing informed consent as required by Oregon statute, ORS 677.097. Dr. Thomas used is experience and expertise as a physician to explain to the parents of his patients the benefits and risks of childhood vaccinations. The results of his work demonstrate the degree to which his work has contributed to the health and safety of the public. Whereas one in in every

forty-five American children has an autism spectrum disorder, out of 1,000 children in Dr. Thomas' practice, not one of them was diagnosed with an autism spectrum disorder.

173.    Nothing in ORS 677.190(1)(a) gives a person of reasonable intelligence notice that Dr. Thomas' conduct of providing informed consent is a violation of ORS 677.190(1)(a). Nothing in ORS 677.190(1)(a) gives a person of reasonable intelligence notice that Dr. Thomas' treatment children in a manner that improves their health is a violation of ORS 677.190(1)(a).

174.    The Board's enforcement of ORS 677.190(1)(a) against Dr. Thomas is arbitrary and discriminatory.

175.    The Board also cited ORS 677.190(13), gross negligence, as a basis for its suspension of Dr. Thomas' license.

176.    Nothing in ORS 677.190(13) gives a person of reasonable intelligence notice that Dr. Thomas' conduct of providing informed consent is a violation of ORS ORS 677.190(13). Nothing in ORS 677.190(13) gives a person of reasonable intelligence notice that Dr. Thomas' treatment children in a manner that improves their health is a violation of ORS 677.190(13).

177.    The Board also cited ORS 677.205(3) and ORS 183.430(2), permitting suspension of a license for practices constituting an immediate danger to the public.

178.    Nothing in ORS 677.205(3) gives a person of reasonable intelligence notice that Dr. Thomas' conduct of providing informed consent, or that improving the health of children, is a violation of ORS 677.205(3).

179.    Nothing in ORS 183.430(2) gives a person of reasonable intelligence notice that Dr. Thomas' conduct of providing informed consent, or that improving the health of children, is a violation of ORS 183.430(2).

180.    Legal rules must be defined with sufficient clarity such that people of reasonable intelligence will be able to discern what conduct is prohibited. ORS 677.190(1)(a), 677.188(4), 677.190(13), 677.205(3), and 183.430(2) are unconstitutionally vague.

### SIXTH CLAIM FOR RELIEF

**VIOLATION OF SUBSTANTIVE DUE PROCESS UNDER
14TH AMENDMENT TO THE UNITED STATES CONSTITUTION
(42 U.S.C. § 1983)**

**ARBTRARY AND UNREASONABLE ACTION – NO DANGER**

181.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

182.    The Board suspended Dr. Thomas' license on the grounds that providing informed consent, as required by law, on childhood vaccines was a danger to the public.

183. Dr. Thomas' patients are significantly healthier than the average child due to Dr. Thomas' performance as a doctor.

184. None of the situations cited by the Board demonstrated that Dr. Thomas did anything to endanger his patients or the public.

185. The Board's suspension of Dr. Thomas was clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.

## SEVENTH CLAIM FOR RELIEF

### VIOLATION OF SUBSTANTIVE DUE PROCESS UNDER 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

#### ARBTRARY AND UNREASONABLE ACTION – NO EMERGENCY

186. Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

187. The Board suspended Dr. Thomas' license on the grounds that his practice of medicine was an immediate danger to the public.

188. The Board's allegations were based on incidents that occurred long before December 2020. The incidents relied on for Patients A, C, and E were seven to nine years before the emergency suspension. Nothing in the Board's rationale for the emergency suspension of Dr. Thomas' license showed that there was an immediate danger to the public.

189.    The Board's emergency suspension of Dr. Thomas was clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a jury trial of all issues triable to a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A.    A judgement for damages against Defendants in the amount of at least 35 million dollars;

B.    Attorney fees; and

C.    Such other and further relief and the Court deems just.

Respectfully submitted,

Dated:  August 3, 2022          By:    s/ *Stephen J. Joncus*
**Stephen J. Joncus**, OSB No. 013072
Email: steve@joncus.net
JONCUS LAW P.C.
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
Telephone: (971) 236-1200
Facsimile: (971) 244-7997
steve@joncus.net

*Attorney for Plaintiff*