Stephen J. Joncus
Oregon Bar No. 013072
Joncus Law P.C.
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
Telephone: (971) 236-1200
Facsimile: (971) 244-7997
steve@joncus.net

*Attorney for Paul Thomas, M.D.*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| Paul Thomas, MD, | Case No. 3:22-cv-944-JR |
| Plaintiff | |
| v. | |
| Kathleen Harder, MD; Saurabh Gupta, MD; Erin Cramer, PA-C; Robert Cahn, MD; James Lace, MD; Charlotte Lin, MD; Patti Louie, PhD; Jennifer Lyons, MD; Ali Mageehon, PhD; Chere Pereira; Chris Poulsen, DO; Andrew Schink, DPM; Jill Shaw, DO; Eric Brown; Jason Boemmels; and David Farris, MD, | **DR. PAUL THOMAS' OPPOSITION TO MOTION TO DISMISS** |
| Defendants. | Oral Argument Requested |

# Table of Contents

Introduction ...................................................................................................................1

Argument ........................................................................................................................2

I. Defendants are not entitled to absolute immunity...........................................................2

  A.  The Board did not have the authority that they exercised ....................................2

    1. The Board did not simultaneously file a Complaint ..........................................3

    2. The Board had no power to act without evidence
       of an immediate danger to the public ..................................................................5

    3. The Board had no power to suspend Dr. Thomas' license
       on the basis of an imaginary requirement .........................................................8

    4. The Board had no power to suspend Dr. Thomas'
       pursuant to unconstitutionally vague statutes ................................................13

  B.  The function of investigating is not entitled to absolute immunity ...................14

  C.  The function of supervising employees is not entitled
     to absolute immunity...........................................................................................17

  D.  The Board is not immune under the *Butz* factors...............................................18

    1. Corrupt actions by the Board members do not entitle
       them to be free from this lawsuit......................................................................19

    2. There are not adequate safeguards ..................................................................20

    3. The Board is subject to political influence ......................................................22

    4. There is no precedent for Dr. Thomas' case ....................................................23

    5. There was no adversarial process.....................................................................24

    6. The error is not correctable on appeal of the administrative process..............24

    7. The Board acted with malice ...........................................................................25

      (a) The Board's suspension came just days after
         publication of Dr. Thomas' study .............................................................26

      (b) The Board's emergency suspension order was
         designed to smear Dr. Thomas .................................................................27

II.  Dr. Thomas has valid constitutional claims ...........................................................29

  A.  Dr. Thomas has an actionable free speech claim.................................................29

    1. The Board's suspension is an unjustified attack
      on the content of Dr. Thomas' speech ............................................................29

    2. Defendants' temporal argument is nonsense..................................................32

    3. Defendants' emergency order is presumptively unconstitutional ..................33

  B.  Plaintiff has an actionable Procedural Due Process claims.................................34

    1. An unauthorized suspension process violates due process ............................34

    2. Fabrication of evidence is a Procedural Due Process violation .......................35

    3. Supervisory liability is a Procedural Due Process violation ............................35

    4. The Oregon Statutes relied on by the Board
      are unconstitutionally vague ...........................................................................36

  C.  Dr. Thomas has actionable Substantive Due Process claims ............................37

III.  Defendants are not entitled to qualified immunity ...............................................40

Conclusion ...................................................................................................................41

Cases

*Buchler v. State,* 316 Or. 499 (1993) ..........................................................................11

*Buckley v. Fitzsimmons,* 509 U.S. 259 (1993) ...............................................14, 15, 16, 17

*Butz v. Economou,* 438 U.S. 478 (1978) ......................................................................18

*Chalkboard, Inc. v. Brandt,* 902 F.2d 1375 (9th Cir. 1989) .......................................passim

*City of Chicago v. Morales,* 527 U.S. 41 (1999) ..............................................................37

*Cleavinger v. Saxner,* 474 U.S. 193 (1985) .........................................................18, 19, 25

*Colorado State Board of Medical Examiners v. Weiler,* 157 Colo. 244 (1965) .....................11

*County of Sacramento v. Lewis,* 523 U.S. 833 (1998) .......................................................38

*Elliot v. Staton,* 2012 U.S. Dist. LEXIS 87449 (D. Or. Apr. 20, 2012) ..........................39

*Engquist v. Oregon Dept. of Agric.,* 478 F.3d 985 (9th Cir. 2007) .....................................39

*Foster v. Med. Bd. of Cal.,* No. C-01-355,
   U.S. Dist. LEXIS 14616 (N.D. Cal. Aug. 5, 2002) .................................................15

*Forrester v. White,* 484 U.S. 219 (1988) .......................................................................17

*Garmon v. County of Los Angeles,* 828 F.3d 837 (9th Cir. 2016) .......................................17

*Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972) ...................................................36

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ...................................................................40

*Jarkesy v. SEC,* 34 F.4th 446 (5th Cir. 2022) ...............................................................21

*Keates v. Koile,* 883 F.3d 1228 (9th Cir. 2018) .............................................................40

*Kolender v. Lawson,* 461 U.S. 352 (1983) ....................................................................37

*McKenna v. Wright,* 386 F.3d 432 (2nd Cir. 2004) .........................................................40

*Megdal v. Oregon State Board of Dental Examiners,* 288 Or. 293 (1980) ............................12

*Mishler v. Clift,* 191 F.3d 998 (9th Cir. 1999) ..............................................................16

*Mooney v. Holohan,* 294 U.S. 103 (1935) ....................................................................35

*National Inst. of Family and Life Advocates v. Becerra,*
   138 S. Ct. 2361 (2018) ................................................................................passim

*Olsen v. Idaho State Bd. of Med.,* 363 F.3d 916, 930 (2004) ...........................................16

*Papchristou v. City of Jacksonville,* 405 U.S. 156 (1972) ...........................................13, 14

*Patel v. Penman*, 103 F.3d 868 (9th Cir. 1996) ................................................38

*Pennsylvania State Bd. of Pharmacy v. Cohen*, 448 Pa. 189 (1972) ......................11

*Powers v. Quigley*, 345 Or. 432 (2008) ..................................................................5

*Preschooler II v. Clark Cty. Sch. Bd. of Trs.*, 479 F.3d 1175 (9th Cir. 2007) ....................35

*Sagana v. Tenorio*, 384 F.3d 731 (9th Cir. 2004) ...........................................38

*SAIF Corp. v. Shipley*, 326 Or. 557 (1998) .......................................................2

*Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936 (9th Cir. 2004) ..........................38

*Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075 (9th Cir. 2009) ...........................40

*Washington v. Glucksberg*, 521 U.S. 702 (1990).................................................11

Statutes

ORS 127.649 ..........................................................................................................10

ORS 174.020 ............................................................................................................5

ORS 431.180 ..........................................................................................................11

ORS 433.267 ....................................................................................................10, 23

ORS 677.097 ................................................................................................9, 10, 23

ORS 677.190 ....................................................................................................9, 10

ORS 677.200 ............................................................................................................3

ORS 677.205 ..................................................................................................2, 5, 34

ORS 677.265 ............................................................................................................3

Other Authorities

Black's Law Dictionary .......................................................................................7

Jeremy R. Hammond, The War on Informed Consent;
    The Persecution of Dr. Paul Thomas by the
    Oregon Medical Board (2021) ...............................................................23, 25

Paul Thomas, M.D. and Jennifer Margulis, Ph.D,
    The Vaccine-Friendly Plan (2016) ..............................................................28

# INTRODUCTION

Dr. Thomas is a hero. Through observation and scientific inquiry he has succeeded in preventing vaccine injuries in his patients. For those children that are injected with vaccines according to the CDC recommended schedule, one in forty-five is diagnosed with autism. Dr. Thomas recommends a different approach as described in detail in his book, The Vaccine-Friendly Plan. None of the 1,000 patients who followed Dr. Thomas' recommendations developed autism. If you had a child, would you not want to hear Dr. Thomas advice?

Rather than celebrate Dr. Thomas' success, and learn the lessons of Dr. Thomas' experience, the members of the Oregon Medical Board ("Board") sought to silence Dr. Thomas. The CDC recommended vaccine schedule is a sacred cow of the modern medicine. Pharmaceutical companies rake in billions of dollars from the sale of childhood vaccines that get repeatedly injected into virtually every child. Powerful and secretive forces, financed by the pharmaceutical companies, have great influence on the Board and the minds of many doctors. To protect the sacred cow, the Board suspended Dr. Thomas thereby isolating him, discrediting him, and making him an example so that no other doctor would dare question the sacred cow.

But Dr. Thomas has constitutional rights and any immunity that Defendants might have had fails because of the way they have behaved.

# ARGUMENT

## I.  Defendants are not entitled to absolute immunity.

### A.  The Board did not have the authority that they exercised.

"State law must authorize the prosecutorial or judicial function to which absolute immunity attaches."[1] "An agency has only those powers that the legislature grants and cannot exercise authority that it does not have."[2] There is nothing in Oregon law that authorizes the action that the Board took.

The statute reads: "the board may temporarily suspend a license without a hearing, simultaneously with the commencement of proceedings under ORS 677.200 if the board finds that evidence in its possession indicates that a continuation in practice of the licensee constitutes an immediate danger to the public."[3] ORS 677.200 requires "A written complaint of some person, not excluding members or employees of the Oregon Medical Board, shall be verified and filed with the board."

The Board acted without statutory authority, and as a result the members are not entitled to absolute immunity.

---

[1] *Chalkboard, Inc. v. Brandt*, 902 F.2d 1375, 1379 (9th Cir. 1989).
[2] *SAIF Corp. v. Shipley*, 326 Or. 557, 561 (1998).
[3] ORS 677.205(3).

1. ***The Board did not simultaneously file a Complaint.***

The Board only has power to suspend a license as provided by Oregon statute.[4] The Board's power is limited to suspending licenses in accordance with Chapter 677.[5] Any disciplinary proceeding must be initiated with a written complaint.[6] Oregon statute only allows the Board to issue an emergency suspension is if it simultaneously files a complaint and opens a case.[7] The Board failed to simultaneously file a written complaint.[8] Indeed, there was no form of complaint filed until April 22, 2021, nearly five months after the emergency suspension order.[9]

ORS 677.205(3) defines the statutory requirements for due process created by the Oregon legislature.[10] But the Board bypassed the statutory procedure entirely. The Board assumed a power that state law denies them and were therefore not serving in a judicial capacity that confers absolute immunity.[11]

The Ninth Circuit explained in *Chalkboard* that to maintain absolute immunity the state officials must operate within their statutory authority. In *Chalkboard*, Boyd

---

[4] ORS 677.265(2)
[5] ORS 677.265(2)
[6] ORS 677.200
[7] ORS 677.205(3).
[8] Amended Complaint ¶ 84.
[9] *Id*.
[10] Dr. Thomas does not concede that ORS 677.205(3) meets the constitutional requirements for due process. ORS 677.205(3) flunks the test for due process rights under the 14th Amendment as argued below.
[11] *See Chalkboard*, 902 F.2d at 1379.

Dover, the Deputy Director of Arizona's Department of Health Services, summarily suspended the license of Chalkboard, a day care center, on the grounds of alleged sexual molestation, physical abuse, and overcrowding.[12] But there was no statutory authority for Dover's action. The Arizona statute did not authorize the procedure used by Dover. The Ninth Circuit denied Dover's assertion of absolute immunity because "state law must authorize the prosecutorial or judicial function to which absolute immunity attaches."[13] By "arrogating to themselves a function that state law denies them, defendants have not served in a judicial or prosecutorial capacity that conferred absolute immunity."[14] The Ninth Circuit agreed with the district court in *Chalkboard* that the Defendants were not entitled to absolute immunity.[15]

The same applies to the Board. Oregon law denies the Board the ability to suspend Dr. Thomas' license without simultaneously filing a complaint. By issuing the suspension order outside of its statutory authority, the Board members are not entitled to absolute immunity.[16]

Defendants cannot resort to the more general statute in the Administrative Procedures Act cited by the Board. While the requirements under the more general

---

[12] *Id.* at 1377.
[13] *Id.* at 1379.
[14] *Id.*
[15] *Id.* at 1380.
[16] *Id.*

statute ORS 183.430(2) does not contain the requirement that a case be simultaneously filed, the more general law is inapplicable. Under Oregon law the more specific statute for physicians trumps a conflicting general statute.[17] Hence the Board cannot rely on ORS 183.430(2) and was required to simultaneously file a complaint as required by ORS 677.205(3).[18]

Oregon law denies the Board the ability to suspend Dr. Thomas' license without simultaneously filing a complaint. The Board acted outside of its statutory authority and is not entitled to absolute immunity.[19]

2. **The Board had no power to act without evidence of an immediate danger to the public.**

In order to suspend Dr. Thomas' license under ORS 677.205(3) the Board there must be evidence in its possession that indicates that Dr. Thomas' practice of medicine is an immediate danger to the public.[20] No such evidence exists.[21]

---

[17] ORS 174.020(2); *Powers v. Quigley*, 345 Or. 432, 438 (2008) ("if two statutes are inconsistent, the more specific statute will control over the more general one").
[18] *See Chalkboard*, 902 F.2d at 1378-79.
[19] *See id.* at 1379.
[20] ORS 677.205.
[21] Amended Complaint ¶ 86.

The Board's allegations were for alleged incidents for Patient A in 2013,[22] Patient B in 2018,[23] Patient C in 2013,[24] Patient D in 2017,[25] Patients G and H in 2019, and for obtaining immunity tests from patients between 2002 and 2015. These allegations, even if assumed to be true—which they are not—occurred years before the suspension, and cannot be grounds for an emergency.

Additionally, the substance of these cases cannot be grounds for an emergency. They are not, for instance, allegations of: a doctor indicted for distributing anabolic steroids;[26] a doctor placing unnecessary stents in six patients' arteries during surgery;[27] or of a doctor amputating the wrong leg of a patient.[28] Not one of the Board's allegations alleged that Dr. Thomas' practice of medicine had harmed a patient. Not one of the Board's allegations reflected that an immediate harm to a patient would occur due to Dr. Thomas' practice.

ORS 677.205(3) specifies the statutory limitation of the Board's power to suspend. That power is not infinitely flexible to whatever the Board decides it wants to

---

[22] *Id.* at ¶ 97.
[23] *Id.* at ¶ 99.
[24] *Id.* at ¶ 106.
[25] *Id.* at ¶¶ 109-111.
[26] https://news.delaware.gov/2011/12/13/department-of-justice-seeks-emergency-suspension-of-doctor-immediate-danger-to-public-health-cited/
[27] https://www.kmbc.com/article/board-issues-emergency-suspension-for-mo-doctor/3673592#
[28] https://www.nytimes.com/1995/09/17/us/doctor-who-cut-off-wrong-leg-is-defended-by-colleagues.html

do. The Board must have evidence of an "immediate danger" to the public. The word

"immediate" means:

> 1. Occurring without delay; instant <an immediate acceptance>. 2. Not separated by other person or things <her immediate neighbor>. 3. Having a direct impact; without intervening agency <the immediate cause of the accident>.[29]

The word "danger" means:

> 1. Peril; exposure to harm, loss, pain, or other negative result. 2. A cause of peril; a menace.[30]

Nothing in the Board's Order of Emergency Suspension describes facts meeting the

definition of an "immediate danger."

Moreover, the Board styled called its suspension an "Order of Emergency

Suspension." The word "emergency" means:

> 1. A sudden and serious event or an unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm. 2. An urgent need for relief or help.[31]

Nothing in the Board's Order of Emergency Suspension describes facts meeting the

definition of an "emergency."[32]

---

[29] *Immediate*, BLACK'S LAW DICTIONARY (10th ed. 2014).
[30] *Danger*, BLACK'S LAW DICTIONARY (10th ed. 2014).
[31] *Emergency*, BLACK'S LAW DICTIONARY (10th ed. 2014).
[32] Am. Compl. ¶¶ 86, 96-125.

The Board acted outside its statutory authority by suspending Dr. Thomas'
license when there was no immediate danger and no emergency. The Board is not
entitled to absolute immunity.[33]

3.      **The Board had no power to suspend Dr. Thomas' license
        on the basis of an imaginary requirement.**

This case boils down to the Board's contention that Dr. Thomas fails to
vaccinate his patients. Both Defendants' motion and the emergency suspension make
this clear:

- Dr. Thomas "not vaccinating three children who were hospitalized with rotavirus
  gastroenteritis";[34]

- Dr. Thomas "not vaccinating a sixth child over a course of seven years";[35]

- "his failure to adequately vaccinate children is grossly negligent";[36]

- "OMB suspended plaintiff's license because he was not meeting the basic standard of
  care relating to administering vaccinations to protect the health and safety of his
  patients.";[37]

- "Licensee failed to ensure these patients were given the required second dose of
  MMR as soon as he obtained the test results."[38]

The only authority relied on by the Board is the CDC recommended schedule,[39]
but the CDC recommended vaccine schedule is merely a recommendation.[40] The Board

---

[33] *See Chalkboard*, 902 F.2d at 1379.
[34] Motion p. 5.
[35] Motion p. 5.
[36] Motion, Ex. A. p. 3.
[37] Motion p. 14.
[38] Motion, Ex. A p. 6.
[39] Am. Compl. ¶ 4.
[40] Am. Compl. ¶ 87.

believes that the CDC recommendations are correct.[41] But neither the CDC nor the Board have any duty to patients.

In contrast, Dr. Thomas has a statutory duty to provide his patients with informed consent.[42] Dr. Thomas is prohibited from making false or misleading statements to his patients.[43] Dr. Thomas knows how much healthier kids are without childhood vaccination or with light childhood vaccination—he wrote a book about it.[44] Following his advice, not a single child out of 1,000 was diagnosed with autism whereas 1 in every 45 children who follow the CDC recommendations are diagnosed with autism.[45] In a subsequent study of patients from his own practice, Dr. Thomas found definitive proof that unvaccinated kids are much healthier than vaccinated kids for a whole range of maladies.[46]

Could Dr. Thomas ignore all the knowledge that he has when he informs patients about the risks and benefits of childhood vaccines? Of course not—Dr. Thomas could not honestly inform his patients in manner that would ignore his own experience and the scientific results. Informing patients based on experience and on the science are what doctors are supposed to do. Dr. Thomas would be violating his

---

[41] *See e.g.*, Am. Compl. ¶ 87.
[42] ORS 677.097.
[43] ORS 677.190.
[44] Am. Compl. ¶ 57.
[45] Am. Compl. ¶¶ 70-71.
[46] Am. Compl. ¶¶ 70-71, 80.

statutory duty to tell the truth[47] about childhood if he did not give patients the facts that he knows about childhood vaccines.

The Board have created an unwritten imaginary rule that pediatricians must vaccinate their patients. The Board's imaginary rule conflicts with the statutory requirement to give informed consent[48] and tell the truth about the benefits and risks of childhood vaccines.[49] It is a Catch-22. Informing parents truthfully about childhood vaccines leads to unprofessional conduct according to the Board. Lying about his knowledge and experience violates his statutory duty to patients.[50]

Does Dr. Thomas, or any other doctor, have the power to vaccinate his patients? No. There is also no authority in Oregon requiring a physician to vaccinate patients. Zero, zip, nada. The Board has created an imaginary requirement and then suspended Dr. Thomas' license *on an emergency basis,* for failing to follow their imaginary rule.

The Board's imaginary rule that pediatricians must vaccinate their patients also conflicts with other statutory requirements and patients' fundamental constitutional rights. Individuals have the absolute right to make their own healthcare decisions.[51] Parents have the absolute right to refuse to immunize their child.[52] Individuals have a

---

[47] ORS 677.190(9).
[48] ORS 677.097 (standard for informed consent).
[49] ORS 677.190(9) (prohibiting providing false information to patients).
[50] ORS 677.097; 677.190(9).
[51] ORS 127.649.
[52] ORS 433.267.

fundamental right to refuse medical treatment.[53] Oregon has no power to interfere with an individual's right to choose what medical treatment they receive.[54] The Board's imaginary rule flies in the face of all these contrary authorities.

Similarly, the Board's imaginary rule cannot be applied under the guise of a negligence claim against Dr. Thomas. For Dr. Thomas to be negligent for not vaccinating his patients there must be a duty to vaccinate.[55] No such duty exists in Oregon or anywhere else. A duty to vaccinate would fly in the face of all the statutory rights cited above that prohibit a doctor from making medical decisions for his patients.

The Board is not authorized to make up its own unwritten imaginary rule that pediatricians must vaccinate their patients. The Board is without authority to make such a rule and is without authority to apply such a rule under the guise of "unprofessional conduct" or "gross negligence."

The Board's authority comes solely from the statute itself and it cannot create new grounds for the suspension of a license.[56] The Board is authorized to promulgate rules that further define "unprofessional conduct." But the term "unprofessional

---

[53] *Washington v. Glucksberg*, 521 U.S. 702, 720 (1990) (the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment).

[54] ORS 431.180.

[55] *See Buchler v. State*, 316 Or. 499, 509 (1993).

[56] *See Pennsylvania State Bd. of Pharmacy v. Cohen*, 448 Pa. 189, 205 (1972), citing *Colorado State Board of Medical Examiners v. Weiler*, 157 Colo. 244, 250 (1965).

conduct" is not an adequate guide for deciding individual cases.[57] The Board is not free to decide ad hoc what constitutes "unprofessional conduct."[58]

The Board's strategy of punishing speech has been used as tool of government oppression by many others. "Regulating the content of professionals' speech poses the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information."[59] "Throughout history, governments have manipulated the content of doctor-patient discourse to increase state power and suppress minorities."[60]

> For example, during the Cultural Revolution, Chinese physicians were dispatched to the countryside to convince peasants to use contraception. In the 1930s, the Soviet government expedited completion of a construction project on the Siberian railroad by ordering doctors to both reject requests for medical leave from work and conceal this government order from their patients. In Nazi Germany, the Third Reich systematically violated the separation between state ideology and medical discourse. German physicians were taught that they owed a higher duty to the 'health of the Volk' than to the health of individual patients. Recently, Nicolae Ceausescu's strategy to increase the Romanian birth rate included prohibitions against giving advice to patients about the use of birth control devices and disseminating information about the use of condoms as a means of preventing the transmission of AIDS.[61]

---

[57] *Megdal v. Oregon State Board of Dental Examiners*, 288 Or. 293, 298 (1980).
[58] *Id*. at 320-21.
[59] *National Inst. of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2374 (2018).
[60] *Id*.
[61] *Id*.

"When the government polices the content of professional speech, it can fail to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail."[62] *"The people lose when the government is the one deciding which ideas should prevail."*[63]

The Board is outside its statutory authority by trying to control Dr. Thomas' professional speech under the guise of either unprofessional conduct or negligence. The Board acted outside of its statutory authority when it suspended Dr. Thomas based on an imaginary requirement. Because it by-passed the statutory requirements and acted outside of its statutory authority, the Board arrogated to itself a right to dictate rules that state law denies them, and defendants have not served in a judicial or prosecutorial capacity that conferred absolute immunity.[64]

4. ***The Board had no power to suspend Dr. Thomas' pursuant to unconstitutionally vague statutes.***

Legal rules must be defined with sufficient clarity such that people of reasonable intelligence will be able to ascertain what conduct is prohibited and to prevent the arbitrary application of the law.[65]

If Oregon's statutes for disciplining physicians is broad enough to allow the Board to assert the unwritten ad hoc rule that pediatricians must vaccinate their

---

[62] *Id.*
[63] *Id.* at 2375 (emphasis added).
[64] *See Chalkboard*, 902 F.2d at 1379.
[65] *Papchristou v. City of Jacksonville,* 405 U.S. 156, 162 (1972).

patients, then those statutes are unconstitutionally vague. The statutes are also unconstitutionally vague if they permit the Board to assert unwritten ad hoc controls on Dr. Thomas' speech. The statutes are unconstitutionally vague, both in the sense that they fail to give fair notice that Dr. Thomas' speech was forbidden, and in the sense that they encourage arbitrary and discriminatory enforcement.[66]

Because the statutes are unconstitutional, the Board was without power to suspend Dr. Thomas' license and defendants have not served in a judicial or prosecutorial capacity that conferred absolute immunity.[67]

B.      The function of investigating is not entitled
        to absolute immunity.

Two kinds of immunity are recognized under § 1983 cases.[68] "Most public officials are entitled to only qualified immunity."[69] Only some officials perform special functions that deserve absolute protection from damages liability.[70] Such officials bear the burden of showing that absolute immunity is justified for the function that they

---

[66] *Id.* at 162.
[67] *See Chalkboard*, 902 F.2d at 1379.
[68] *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993).
[69] *Id.*
[70] *Id.*

performed.[71] "Not surprisingly, we have been *quite sparing* in recognizing absolute immunity for state actors in this context."[72] The analysis is functional.[73]

The function of investigative work is not shielded by absolute immunity.[74] There is a difference between a prosecutor's preparation for trial and a detective's role in searching for evidence.[75] Because a police officer is not absolutely immune when searching for evidence, neither is a prosecutor.[76] A prosecutor is only absolutely immune for his role as an advocate for the state in preparing for judicial proceedings.[77]

Investigators Brown and Boemmels merely investigated.[78] The function of investigating that they performed is not entitled to absolute immunity. Their role is akin to police officers who are not entitled to absolute immunity.[79]

---

[71] *Id*. at 268-69.

[72] *Id*. at 269.

[73] *Id.*

[74] *Id.* at 276.

[75] *Id*. at 273.

[76] *Id*. at 273-74.

[77] *Id*. at 272-73.

[78] Am. Compl. ¶¶ 21, 22, 149, 150, and 151.

[79] *See Buckley*, 509 U.S. at 273-74; *Foster v. Med. Bd. of Cal.*, No. C-01-355, U.S. Dist. LEXIS 14616, at *5-6 (N.D. Cal. Aug. 5, 2002) (the job of an investigator for the Medical Board of California "consisted of gathering and reviewing medical records, interviewing witnesses, and preparing a report for review by his supervisor. Such investigatory actions are not the sort that entitle Ball to absolute prosecutorial immunity.").

It is Defendants' burden to show that functions performed by investigators Brown and Bommels are entitled to absolute immunity,[80] but Defendants make no showing at all. It is not enough to argue that the Board members are entitled to immunity, therefore all the staff members are too. Each Defendant has the burden to show that his or her function is entitled to absolute immunity. The investigative work by Brown and Bommels is not a function that is protected by absolute immunity.[81]

The Ninth Circuit cases relied on by Defendants do not have the broad applicability that Defendants imply. In *Olsen*, the Ninth Circuit determined that the Idaho medical boards were <u>not entitled to absolute immunity</u> for all of their acts.[82] However, because of statute of limitations problems for the plaintiff in that case, the plaintiff did not state a claim. Similarly, in *Mishler*, the Ninth Circuit affirmed the denial of a motion to dismiss because the Nevada Board of Medical Examiners <u>was not absolutely immune</u> from every claim.[83]

---

[80] *See Buckley*, 509 U.S. at 268-69.

[81] *See id.*

[82] *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 930 (2004).

[83] *Mishler v. Clift*, 191 F.3d 998, 1009 (9th Cir. 1999).

## C. The function of supervising employees is not entitled to absolute immunity.

The members of the Board[84] and Executive Director[85] each failed to

properly supervise investigators Brown and Bommels.[86] Additionally, Executive

Director Farris participated in the fabrication of evidence by Brown and

Boemmels.[87]

Supervisors are only immune to the extent that the employees that they

are managing are immune. A supervisor is not absolutely immune for

supervising an activity that is not protected by absolute immunity.[88] A judge is

not absolutely immune for acts that are not judicial in nature such as when

acting in an administrative capacity in the supervision of employees.[89] The

function of supervising performed by the members of the Board and the

Executive Director is not entitled to absolute immunity.

Each of these Defendants have the burden of showing that they are

entitled to absolute immunity in their supervisory role,[90] and they have made

---

[84] Kathleen Harder, Saurabh Gupta, Erin Cramer, Robert Cahn, James Lace, Charlotte Lin, Patti Louie, Ali Mageehon, Chere Pereira, Chris Poulsen, Andrew Schink, and Jill Shaw.
[85] David Farris.
[86] Am. Compl. ¶¶ 156-168.
[87] Am. Compl. ¶ 156.
[88] *Garmon v. County of Los Angeles*, 828 F.3d 837, 845 (9th Cir. 2016).
[89] *Forrester v. White*, 484 U.S. 219, 228-30 (1988).
[90] *See Buckley*, 509 U.S. at 268-69.

absolutely no showing at all. Executive Director Farris and each member of the Board are not entitled to absolute immunity for the function of supervising the Board's employees.

      **D.**    **The Board is not immune under the *Butz* factors.**

While this District and the Ninth Circuit have found that members of a medical board have absolute immunity for performing judge-like functions, the facts in this case are distinguishable. Moreover, the Supreme Court has never found that an administrative medical board is entitled to absolute immunity. Whether a member of the Board is entitled to absolute immunity for the function that each performed in a particular fact scenario depends on analysis of the *Butz* factors.[91] The non-exclusive factors are:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) the [agency's] insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal."[92]

---

[91] *Butz v. Economou,* 438 U.S. 478, 512 (1978).

[92] *Cleavinger v. Saxner,* 474 U.S. 193, 202 (1985) (citing *Butz v. Economou,* 438 U.S. 478, 512 (1978)).

1. ***Corrupt actions by the Board members do not entitle them to be free from this lawsuit.***

The function exercised by the Board in this case is not a classic adjudicatory one.[93] The Board Defendants summarily suspended Dr. Thomas' license as their first official act. No judge in a civil case has the power to summarily deprive a property right from someone without first engaging in a lengthy process. The Board Defendants were not behaving like a judge when they issued the suspension. They were behaving like an adverse litigant, a judge, and a jury all rolled up in one; and they imposed a civil penalty that stripped Dr. Thomas of his license without any notice or due process. No judge has such power. Such power is not entitled to the benefit of the doubt or to be exercised without question. Indeed, the wielding of such unprecedented power requires that victims have every possible mechanism to challenge inexcusable deprivations.

Moreover, the Board Defendants were not wielding their extraordinary power to respond to what had already been determined by another authority to be an objectively dangerous and immediate situation. For instance, this case is nothing like scenarios where a doctor has been arrested from drunk driving while on-call for medical duty, or accused of sexual harassment of a patient, or indicted for using his medical license to distribute illegal drugs, or suspended by a hospital for amputating the wrong leg. All of

---

[93] *See id.* at 203.

these hypothetical scenarios would involve other processes that give credence to an emergency suspension without notice by the Board. These also all involve actual and immediate threats of physical danger to the public.

No, the Board suspended Dr. Thomas because they did not like the content of his speech. The suspension came just days after he published a paper exposing the danger of childhood vaccines.[94] The CDC recommended schedule is a sacred cow of modern medicine. The Board could not leave such heresy to go unpunished. The Board acted to isolate Dr. Thomas, discredit him, and make him an example to other doctors.

The Board Defendants were not performing the function of a judge in Dr. Thomas' case. They were performing the function of vigilantes. Such conduct is not entitled to be immune from this damages lawsuit.

The first *Butz* factor weighs in favor of Dr. Thomas in this case.

2. ***There are no adequate safeguards.***

An administrative process is not an adequate safeguard for what the Board did to Dr. Thomas. They destroyed Dr. Thomas' practice in a day. They destroyed his marriage. They destroyed his peace of mind.[95]

The damage done to Dr. Thomas is not correctable in the administrative process. Maybe after he spends a fortune defending himself, Dr. Thomas will prevail on

---

[94] Am. Compl. ¶ 81.
[95] Am. Compl. ¶ 55.

appeal. But he cannot obtain damages in the administrative process. He cannot hold the Board accountable for the damage done to him. And where will he go to get his reputation back? At worst the Board will lose on appeal. But by losing the Board will still have won because they still will have successfully sent a message to every other doctor that they dare not step out of line on what the government says is the truth, their lives will be destroyed.

Oregon's administrative process also does not provide for a trial by jury.[96] Thomas Jefferson identified the jury "as the only anchor, ever yet imagined by man, by which a government can be held to the principles of its constitution."[97] Trial by jury is a fundamental component of our legal system and one of the most vital barriers to governmental arbitrariness.[98]

The Board in this case is fundamentally corrupt. "Civil juries in particular have long served as a critical check on government power."[99] The corruption that is evident in the Board's suspension of Dr. Thomas' license cannot be corrected by an administrative process. It requires a jury.

The second *Butz* factor weigh in favor of Dr. Thomas in this case.

---

[96] *See Jarkesy v. SEC*, 34 F.4th 446, 449 (5th Cir. 2022) (administrative procedure unconstitutional because it failed to provide for a trial by jury).
[97] *Id*. at 451.
[98] *Id*. at 452.
[99] *Id*. at 451.

3.    *The Board is subject to political influence.*

The Board has been captured by the Federation of State Medical Boards ("Federation"), from which it receives its marching orders.[100] The Federation is a secretive private and powerful organization located in Texas.[101] The secretive Federation wields an enormous amount of power over the Board.[102] The Federation is, in turn, funded and controlled by big pharmaceutical companies, the very entities that stand to benefit through preservation of childhood vaccination in almost all children.

The Federation does the bidding of Big Pharma as demonstrated by its campaign for doctors to freely prescribe Oxycontin.[103] The Federation encouraged over prescribing of Oxycontin and even pressured state medical boards to discipline doctors who were not prescribing enough Oxycontin.[104] The Federation is one of the major culpable entities that caused the current opioid crisis.[105]

The Federation has undue influence over the discipline of doctors by the state medical boards.[106] It encourages state medical boards to discipline doctors who share information contrary to the benefit of Big Pharma.[107] The Board has close ties to the

---

[100] Am. Compl. ¶¶ 128-137.
[101] *Id.* ¶ 128.
[102] *Id.*
[103] *Id.* ¶¶ 129-133.
[104] *Id.* ¶¶ 131-32.
[105] *Id.* ¶ 133.
[106] Id. ¶ 135.
[107] *Id.* ¶ 134.

Federation.[108] It is a priority of the Federation to discipline doctors who question the safety and efficacy of childhood vaccines and the Federation pressured the Board to take action against Dr. Thomas.[109]

The Board is subject to the worst kind of political influence—not from government—but from a secretive, private, and unaccountable organization that is under the control of Big Pharma.

The third *Butz* factor weighs in favor of Dr. Thomas in this case.

4.      ***There is no precedent for Dr. Thomas' case.***

There is no precedent for a medical board silencing the speech of a doctor. There is no precedent for a medical board attacking the very notion of informed consent.[110] Contrary to law, the Board contends that it is Dr. Thomas' job to vaccinate children.[111] The Board's position is an abominable deviation from medical ethics and the law. Dr. Thomas' job is to provide information for the purpose of informed consent.[112] It is the parents' right decide whether their children will receive any vaccine.[113] There is no

---

[108] *Id.* ¶ 136.

[109] *Id.* ¶ 137.

[110] *See* JEREMY R. HAMMOND, THE WAR ON INFORMED CONSENT; THE PERSECUTION OF DR. PAUL THOMAS BY THE OREGON MEDICAL BOARD (2021).

[111] *E.g.*, Mot. Ex. A p. 3 (Dr. Thomas' "failure to adequately vaccinate children is grossly negligent").

[112] ORS 677.097.

[113] ORS 433.267.

precedent for a medical board has acted as corruptly as the Board has in Dr. Thomas' case.

The fourth *Butz* factor weighs in favor of Dr. Thomas in this case.

5.    ***There was no adversarial process.***

The Board suspended Dr. Thomas without notice. There was no adversarial process. The Board's suspension was a unilateral decree by a corrupt organization. The unilaterial sneak attack executed by the Board suspending Dr. Thomas license has caused incredible damage to Dr. Thomas.[114]

The fifth *Butz* factor weighs in favor of Dr. Thomas in this case.

6.    ***The error is not correctable on appeal of the administrative process.***

Correction of the error requires an award of damages which are not available through the administrative process. The error is not correctable because even if Dr. Thomas prevails on appeal, the Board and the State of Oregon suffer no loss. Indeed, the Board still wins because it has intimidated any other doctor from following in Dr. Thomas' shoes. The Board still wins because it has effectively punished Dr. Thomas by ruining his livelihood, destroying his marriage, decimating his financial assets, and shattering his peace of mind. The public still loses because the Board's leverage on doctors to compel childhood vaccination in Oregon will continue unabated.

---

[114] Am. Compl. ¶¶ 124-26.

In contrast, in the case of a judge and a trial before a jury, bad behavior by the judge is correctable on appeal, and if the victim of the judge's bad behavior prevails on appeal, he has another chance to vindicate his rights for the damages caused to him in front of a jury. To assert that the Board's error can be corrected on appeal in an administrative process where, no matter the outcome, the Board wins and Dr. Thomas loses, is a fiction that ignores reality.

The sixth *Butz* factor weighs in favor of Dr. Thomas in this case.

7. ***The Board acted with malice.***

The six enumerated *Butz* factors are not the only factors that the Court may consider.[115] In this case the Court should also consider the malice against Dr. Thomas exhibited by the Board. Actual malice by the Board towards a physician should not be a characteristic protected by absolute immunity.

A whole book has been written debunking the Board's lies and underhanded tactics.[116] But two particular circumstances of this case serve to illustrate the Board's actual malice against Dr. Thomas.

---

[115] *Cleavinger*, 474 U.S. at 202 ("in *Butz* the Court mentioned the following factors, among others, as characteristic of the judicial process and to be considered in determining absolute as contrasted with qualified immunity").

[116] JEREMY R. HAMMOND, THE WAR ON INFORMED CONSENT; THE PERSECUTION OF DR. PAUL THOMAS BY THE OREGON MEDICAL BOARD (2021).

(a)   *The Board's suspension came just days after publication of Dr. Thomas' study.*

In early 2019, the Board asked Dr. Thomas to provide evidence that his vaccine-friendly plan was as safe as the CDC recommended schedule.[117] The request was a loaded question to begin with because the safety of the CDC recommended schedule has never been determined by the CDC because *the entire schedule has never been tested for safety*.[118] Nevertheless, Dr. Thomas proceeded with a study to answer the Board's question. The results were stunning. The results showed that unvaccinated children were dramatically healthier than vaccinated children.[119] Five days after Dr. Thomas' study was published, the Board issued an emergency suspension of his license on the grounds that Dr. Thomas was a danger to the public.[120] The evidence relied on by the Board was all years old.[121] The only event occurring in close proximity to the suspension was the publishing of Dr. Thomas' paper.

The timing of the Board's suspension shows that the Board's real concern was Dr. Thomas' effectiveness in criticizing the sacred cow. Their response was authoritarian—they sought to isolate Dr. Thomas, discredit him, and make Dr. Thomas an example so that other doctors would not follow in his footsteps. The Board's action

---

[117] Am. Compl. ¶ 79.
[118] Am. Compl. ¶ 95.
[119] Am. Compl. ¶ 80.
[120] Am. Compl. ¶ 81-82.
[121] Am. Compl. ¶¶ 96-123.

was not motivated by an intent to protect the public—it was motivated by malice

towards Dr. Thomas for daring to question their sacred cow.

      (b)     *The Board's emergency suspension order was designed to smear Dr. Thomas.*

The Board's emergency suspension order contained many lies and deceptions.[122]

Illustrative of the Board's malice and intent to smear Dr. Thomas is their description of

Patient D:

> Patient D, a now 9-year-old male, was completely non-immunized. Patient D sustained a large, deep scalp laceration at home in a farm setting on August 8, 2017, and was treated with colloidal silver and with his parents suturing the wound independently. Patient D subsequently developed acute tetanus requiring intubation, tracheotomy, feeding tube placement and an almost two-month ICU stay at Doernbecher Children's Hospital. Patient D was then transferred to Legacy Rehabilitation. Licensee saw Patient D for follow-up in clinic on November 17, 2017. Licensee's notes documented a referral to a homeopath, recommendation of fish oil supplements, and "phosphatidyl seine." He did not document an informed consent discussion about the risk/benefit of immunization for a child who had just sustained and still had sequelae of, and remained vulnerable despite prior infection, to tetanus, a life-threatening and disabling disease that is preventable by proper vaccination. Licensee's care placed Patient D at serious risk of harm and constitutes gross negligence.[123]

Reading that paragraph, one would naturally conclude that Patient D was Dr.

Thomas patient prior to his accident and hospitalization. The paragraph was designed

so that one would infer that Dr. Thomas is responsible for Patient D's two-month stay

---

[122] Am. Compl. ¶¶ 96-123.
[123] Mot. Ex. A. (Doc. 6-1) pp. 4-5.

in the ICU and it was Dr. Thomas' fault that Patient D was not vaccinated. Why else would the Board tell this story in the context of disciplining Dr. Thomas for failing to vaccinate his patients? The media certainly reached the conclusion that Dr. Thomas was responsible for Patient D's near-death experience, as Patient D was the main storyline used by the media for reporting on Dr. Thomas' case.

But, Patient D was not Dr. Thomas' patient prior to Patient D's injury—Dr. Thomas never saw Patient D until after he recovered from his injury.[124] The Board also left out the fact that Dr. Thomas recommends that children receive the tetanus vaccine in his Vaccine-Friendly plan.[125] Also not disclosed by the Board is the reason why Patent D saw Dr. Thomas after he recovered from his injury. Patient D only saw Dr. Thomas because the hospital would not discharge Patient D without a pediatrician who would follow-up on his health and no other pediatrician would not accept Patient D as a new patient because his parents adamantly refused to vaccinate him.[126]

Each of the Board's other allegations against Dr. Thomas had similar defects. The intent of the Board in including Patient D as evidence in Dr. Thomas' emergency

---

[124] Am. Compl. ¶¶ 109-111.

[125] PAUL THOMAS, M.D. and JENNIFER MARGULIS, PH.D, THE VACCINE-FRIENDLY PLAN, p. 161 (2016) (incorporated into the Amended Complaint by reference, Am. Compl. ¶ 70).

[126] Am. Compl. ¶ 111. This also shows how successful the Board has been at intimidating doctors and destroying informed consent for childhood vaccines, such that it is hard to find a pediatrician who will take a new patient unless the parent agrees in advance to give their child the entire CDC recommended schedule.

suspension order is plain—they intentionally sought to smear Dr. Thomas—which is evidence of actual malice by the Board against Dr. Thomas. The Board's actual malice towards Dr. Thomas should disqualify them from having absolute immunity.

## II.    Dr. Thomas has valid constitutional claims.

### A.    Dr. Thomas has an actionable free speech claim.

#### 1.    *The Board's suspension is an unjustified attack on the content of Dr. Thomas' speech.*

Contrary to Defendants' spin, this case is all about the content of Dr. Thomas speech and his ability to provide informed consent to patients. Defendants have interfered with his ability to communicate about childhood vaccines with his patients.[127]

Defendants attempt to characterize their action as "regulation."[128] But a regulation is something that is written in accordance with rules and procedures that permit public comment. Oregon has no regulation on the content of a doctor's speech concerning childhood vaccines. Dr. Thomas' suspension was not the enforcement of a regulation. It was a naked power play applying an ad hoc imaginary requirement to shut down Dr. Thomas and to intimidate other doctors in Oregon and around the nation.

---

[127] Am. Compl. ¶¶ 138-142.
[128] Mot. p. 12.

The Board's action is directed to the content of Dr. Thomas' communications with his patients. Indeed, the Board admits as much when it argues that it suspended Dr. Thomas because of his "years-long record of pressuring parents not to vaccinate their children."[129] While it is not true that Dr. Thomas "pressured" parents not to vaccinate their children—the Board's argument admits that their issue is with the content of Dr. Thomas' communications with his patients. The Board's suspension is based on the content of Dr. Thomas' speech.

There is not a separate category of speech called "professional speech."[130] In *Family & Life Advocates* the Supreme Court reversed the Ninth Circuit's decision treating professional speech as an inferior category of speech.[131] The Supreme Court's decision in *Family & Life Advocates* is highly relevant to this case.

Generally, content-based impairment of speech is "presumptively unconstitutional and is justified only if the government proves that they are narrowly tailored to serve compelling state interests."[132] "This stringent standard reflects the fundamental principle that **governments have no power to restrict expression** because of its message, its ideas, its subject matter, or its content."[133]

---

[129] Mot. at p. 12.

[130] *National Inst. of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

[131] *Id*. at 2370.

[132] *Id*. at 2371.

[133] *Id*. (internal quotations omitted) (emphasis added).

The only exceptions to this stringent rule are laws that require disclosure of certain factual, noncontroversial information (such as attorney fee disclosures) or regulation of professional conduct, which incidentally involves speech.[134] This case does not involve either exception. The Board is not instituting an informed consent requirement, where none existed before.[135] The Board is disciplining Dr. Thomas for the content of his speech. Because the Board is applying an unwritten rule about the content of Dr. Thomas' speech makes its action all the more insidious. Nor is the Board's action merely "incidentally" impact speech.[136] The Board would have no problem with Dr. Thomas if the content of his informed consent discussions his patients endorsed the CDC recommendations. This case does incidentally involve speech—it is 100% about the content of Dr. Thomas' speech.

The Board's suspension of Dr. Thomas is dangerous exactly for the reasons explained in *Family & Life Advocates*. In this case, the "Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information."[137] For physicians, candor is crucial.[138] "Throughout history, governments have manipulated

---

[134] *Id*. at 2372

[135] *See id*. at 2373 (discussing *Planned Parenthood v. Casey*, 505 U.S. 833 (1992), where the Court upheld a law requiring physicians to obtain informed consent before they could perform an abortion).

[136] *See id*. at 2372.

[137] *See id*. at 2374.

[138] *Id*.

the content of doctor-patient discourse to increase state power and suppress minorities."[139] Silencing of candid physician-patent communication fails to "preserve an uninhibited marketplace of ideas in which trust will ultimately prevail."[140] Suppressing the truth about childhood vaccines is precisely the intent of the Board's suspension of Dr. Thomas.[141]

2. *Defendants' temporal argument is nonsense.*

Dr. Thomas was suspended 5 days after he published his paper exposing the myth that childhood vaccines are safe and effective.[142] Dr. Thomas was in the midst of daily interactions with pediatric patients, where vaccination is commonly a major topic, when the Board took away his license to practice medicine. The Board retaliated against Dr. Thomas because of his paper and halted Dr. Thomas immediate interactions with his patients.

Defendants sought to destroy Dr. Thomas and urgently moved forward in direct response to Dr. Thomas' paper published in November 2020, just five days before his suspension.

---

[139] *Id.*
[140] *Id.*
[141] Am. Compl. ¶ 141.
[142] Am. Compl. ¶¶ 79-81.

3.     *Defendants' emergency order is presumptively unconstitutional.*

The Board's suspension order was not based on any standard of conduct. Parents have the choice of whether to vaccinate their children—it is their decision. To make that decision wisely, they must have information.

The CDC recommendations are not a law, not a rule, and not a standard. The CDC recommendations are simply recommendations by the government, which have become a sacred cow of the medical establishment. Dr. Thomas is a threat to the medical establishment's sacred cow, so he must be silenced, ostracized, and made an example of so that no other doctor will dare question this sacred cow. Accordingly, the Board sprang into action to punish Dr. Thomas to protect their sacred cow.

The Board's intent is to silence contrary views so that parents cannot obtain unbiased information from their Oregon doctor, have nowhere else to turn, and are hoodwinked into agreeing to the childhood vaccination. The Board's sacred cow and the profits flowing to Big Pharma must be protected.

This is dangerous and Orwellian. The government is not the arbiter of truth. Truth comes from "an uninhibited marketplace of ideas in which truth will ultimately prevail."[143] "The people lose when the government is the one deciding which ideas

---

[143] *Family and Life Advocates*, 138 S. Ct. at 2374.

should prevail."[144] The Board's suspension suppressing Dr. Thomas' speech is presumptively unconstitutional.[145]

**B.     Plaintiff has an actionable Procedural Due Process claims.**

Dr. Thomas asserts four procedural due process claims: Claim 2 – Unauthorized License Suspension; Claim 3 – Fabrication of Evidence; Claim 4 – Supervisory Liability; and Claim 5 – Unconstitutionally Vague Statute. Each of these claims are supported by the facts of this case.

1.     *An unauthorized suspension process violates Due Process.*

Oregon statute requires that the Board must file a complaint under ORS 677.200 simultaneously with the issuance of the emergency suspension.[146] Defendants do not even attempt to argue that it followed ORS 677.205(5) when it suspended Dr. Thomas' license. The fact that the Board did not follow ORS 677.205(5) is undisputed.

To the extent that ORS 677.205(5) is constitutionally valid, it proscribes the standard for what process is due to Dr. Thomas. The State itself has specified the due process requirement for emergency suspension. The Defendants are not entitled to second-guess that legislative determination.[147]

---

[144] *Id.* at 2375.
[145] *Id.* at 2371.
[146] ORS 677.205(5).
[147] *See Chalkboard,* 902 F.3d  at 1382.

The Board acted outside its authority under ORS 677.205(5)—Bingo—the Board

violated Dr. Thomas due process rights. Dr. Thomas has stated a claim for Claim 2.

### 2. *Fabrication of evidence is a Procedural Due Process violation.*

The investigators fabricated evidence which was compiled into the suspension

order.[148] Such "deliberate deception" is a procedural due process violation.[149]

Defendants' brief completely ignores this claim. Dr. Thomas has stated a claim for

Claim 3.

### 3. *Supervisory liability is a Procedural Due Process violation.*

Defendants fail to understand Dr. Thomas' claim. Dr. Thomas does not claim

that the supervisory defendants are liable under a *respondeat superior* theory. Dr.

Thomas' claim is distinguishable. Allegations that superiors knew of the violation and

failed to take corrective action states a claim for supervisor liability.[150]

Here Dr. Thomas asserts that each of the Board member defendants and

Executive Director Farris knew of the fabrication of evidence and failed to prevent it.[151]

Dr. Thomas has stated a claim for Claim 4.

---

[148] Am. Compl. ¶¶ 96-123.
[149] *Mooney v. Holohan,* 294 U.S. 103, 112 (1935).
[150] *See e.g., Preschooler II v. Clark Cty. Sch. Bd. of Trs.,* 479 F.3d 1175, 1182 (9th Cir. 2007).
[151] Am. Compl. ¶¶ 155-168.

4.     *The Oregon Statutes relied on by the Board are unconstitutionally vague.*

Defendants like to misstate Dr. Thomas' claim as a strawman, and then argue against the strawman. Contrary to Defendants' argument, Dr. Thomas does not assert that he cannot understand the statutes. But it is a fundamental aspect of due process that a person of reasonable intelligence be able to understand what conduct is prohibited by a statute.[152]

Dr. Thomas, a licensed physician, used his experience and training to explain to the parents of his patients the risks and benefits of childhood vaccinations. The results of his work demonstrate how his expertise has contributed to the health and safety of the public. One in every forty-five American children who follow the CDC recommended vaccine schedule has an autism spectrum disorder. In contrast, not one of the 1,000 children in Dr. Thomas practice who followed his recommended vaccine program has been diagnosed with an autism spectrum disorder.[153] Dr. Thomas' practice has an amazing record of success in doctoring children. The Board should be celebrating his success, learning from it, and awarding him physician-of-the-decade type accolades for his amazing accomplishments.

Instead, the Board took Dr. Thomas' medical license and seeks to prevent him from ever counseling a pediatric patient again in his life because they have determined

---

[152] *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).
[153] Am. Compl. ¶ 172.

that the very speech that has resulted in this unparalleled success is actually a danger to the public. This is Orwellian doublespeak. Up is down and down is up. Peace is war and war is peace.

The statutory scheme that allows this to happen is unconstitutionally vague because it has no identifiable standard.[154] The statutory scheme permits the Board sanction speech that actually improves health while labeling that same speech as a danger to the public. These polar opposites can exist only if there is no identifiable standard present in these statutes. Oregon's statutory scheme vests complete discretion in the hands of the Board to determine whether a doctor may keep his license and are therefore unconstitutional.[155] This statutory scheme relies on the shifting subjective judgments of the Board.[156] Dr. Thomas has stated a claim that Oregon's statutory scheme is unconstitutionally vague.

### C.    Dr. Thomas has actionable Substantive Due Process claims.

Dr. Thomas asserts two substantive due process claims: Claim 6 – Arbitrary and Unreasonable Action – No Danger; and Claim 7 – Arbitrary and Unreasonable Action – No Emergency. Both of these claims are supported by the facts of this case.

---

[154] *See Kolender v. Lawson,* 461 U.S. 352, 358 (1983).
[155] *See id.*
[156] *See City of Chicago v. Morales,* 527 U.S. 41, 62 (1999).

A substantive due process claim lies when "a challenged government action was clearly arbitrary and unreasonable, having no substantial relation to public health, safety, morals or general welfare."[157] "The touchstone of due process is protection of the individual against arbitrary action of government."[158] The Fourteen Amendment's Due Process Clause "serves to prevent governmental power from being used for purposes of oppression"[159] and protects against actions so arbitrary that they shock the conscience."[160]

As described above, the objective results from Dr. Thomas' practice shows dramatic success in preventing vaccine injuries among children, yet the Board suspended him purportedly because he was a danger to the public. The suspension of Dr. Thomas as a public danger is an event that shocks the conscience because it is so contrary to the facts and illustrates a level of malice that is hard to comprehend. The Board's action "was clearly arbitrary and unreasonable, having no substantial relation to public health, safety, morals or general welfare."[161]

---

[157] *Patel v. Penman*, 103 F.3d 868, 874 (9th Cir. 1996).
[158] *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 948 (9th Cir. 2004).
[159] *Sagana v. Tenorio*, 384 F.3d 731, 742 (9th Cir. 2004).
[160] *County of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998).
[161] *Patel*, 103 F.3d at 874.

It is self-evident that a doctor who has been suspended from practice is unable to practice his profession elsewhere. Defendants executed a kill shot on Dr. Thomas. Dr. Thomas has made out a substantive due process claim.[162]

Defendants erroneously cite *Elliot v. Staton*[163] arguing that that case gives rise to qualified immunity. *Elliot* involved the government's treatment of a ***public*** employee which is inapplicable to the government's treatment of the self-employed Dr. Thomas in this case.[164]

Defendants seek to diminish the harm they caused by asserting that the suspension was only temporary. Yes, and a bullet shot through the heart is temporarily in the body until it quickly exits the victim's body. Defendants' suspension destroyed Dr. Thomas' practice. Once a saleable medical practice, it is now worth nothing. Defendants destroyed Dr. Thomas livelihood and his net worth as he was on the cusp of retirement. Defendants destroyed Dr. Thomas' marriage. And Defendants now claim that Dr. Thomas has no recourse for the damages done to him because they are immune to suit.

---

[162] *Engquist v. Oregon Dept. of Agric.*, 478 F.3d 985, 997 (9th Cir. 2007).
[163] *Elliot v. Staton*, 11-cv-1536, 2012 U.S. Dist. LEXIS 87449 (D. Or. Apr. 20, 2012).
[164] *See id.* at *12 ("whether a person has a substantive due process right to his ***public*** employment is an unsettled question of law in the Ninth Circuit.") (emphasis added).

## III.    Defendants are not entitled to qualified immunity.

"Determining claims of qualified immunity at the motion-to-dismiss stages raises special problems for legal decision making."[165]

Defendants make only a very brief argument that the facts do not show constitutional violations. However, "whether a constitutional right was violated . . . is a question of fact."[166] "The plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense."[167] "If the operative complaint contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right, then plaintiff is entitled to go forward with his claims."[168] Through this brief, Dr. Thomas has made multiple arguments about clear violations of clearly established constitutional rights. There is no need to repeat them here.

When the constitutional rights asserted are shown to be clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.[169] Each of Dr. Thomas' constitutional claims is clearly established law as shown by the citations that often date back decades.

---

[165] *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018) (reversing district court's grant of qualified immunity at motion to dismiss stage).
[166] *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 (9th Cir. 2009).
[167] *McKenna v. Wright*, 386 F.3d 432, 436 (2nd Cir. 2004).
[168] *Keates*, 883 F.3d at 1235.
[169] *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982).

Defendants do not attempt to argue that the law on these claims is not clearly established. Defendants' own brief shows that these constitutional claims are clearly established. Defendants are not entitled to qualified immunity.

## CONCLUSION

Dr. Thomas epitomizes what a doctor should be. By following the scientific evidence, Dr. Thomas learned what worked and what did not make sense concerning childhood vaccines. His record of success in avoiding vaccine injuries in his patients makes him a hero. But the Board's sacred cow was being gored. They responded by crushing Dr. Thomas without any authority or justification—and with malice. Under these circumstances none of the Defendants are entitled to any type of immunity. Each should stand trial for their abuse of Dr. Thomas' constitutional rights and be made to pay damages.

Dated:  August 22, 2022          By:     s/ Stephen J. Joncus
                                         **Stephen J. Joncus**, OSB No. 013072
                                         Email: steve@joncus.net
                                         JONCUS LAW P.C.
                                         13203 SE 172nd Ave Ste 166 #344
                                         Happy Valley, Oregon 97086
                                         Telephone: (971) 236-1200
                                         Facsimile: (971) 244-7997
                                         steve@joncus.net

                                         *Attorney for Plaintiff*

CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 8,736 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.